[Cite as *State v. Sexton*, 2020-Ohio-4179.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellant, | : | CASE NO. CA2019-08-133 |
| | : | O P I N I O N |
| - vs - | | 8/24/2020 |
| | : | |
| JOSHUA S. SEXTON, | : | |
| Appellee. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2018-10-1745

Michael T. Gmoser, Butler County Prosecuting Attorney, Michael Greer, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellant

**PIPER, J.**

{¶1} The state of Ohio appeals from the decision of the Butler County Common Pleas Court, which granted Joshua Sexton's motion to suppress evidence. For the reasons that follow, we reverse the lower court's decision.

{¶2} In September 2018, during a traffic stop, a Hamilton, Ohio police officer recovered a small baggie of alleged methamphetamine while conducting a search of Sexton's person. The state indicted Sexton for aggravated possession of methamphetamine and he subsequently moved the court to suppress the state's evidence.

{¶3} The officer who located the narcotics, Detective Brian Wynn, testified at the

suppression hearing. Hamilton Police had been investigating multiple drug complaints at a residence located at 507 South Washington. Police had received the first complaint about this residence months earlier.

{¶4} On September 13, 2018, a concerned neighbor contacted Detective Wynn and relayed that a different neighbor was watching a dark-colored van parked across the street from 507 South Washington. The van's occupant was reportedly engaging in suspicious drug activity and had entered 507 South Washington then returned to the van. This activity was consistent with other drug-related activity that neighbors had been observing at the residence and reporting to police.

{¶5} Detective Wynn was nearby and decided to drive to 507 South Washington. When he approached the address, he saw a van driving away on a nearby street. Detective Wynn called the neighbor who had been watching the van and asked whether the van had just left the scene. The neighbor confirmed it had.

{¶6} Detective Wynn followed the van for a short time and observed it fail to signal a turn. Detective Wynn stopped the van. Sexton was driving and there were no passengers.

{¶7} During the hearing, the state played the "cruiser cam" video and audio recording of the stop. After pulling over Sexton, Detective Wynn immediately left his patrol vehicle and approached the driver side of the van to speak with Sexton. The audio did not record this part of the stop, but Detective Wynn testified that he engaged Sexton in a general conversation, "registration, things like that, where he was coming from, who owned the vehicle." Sexton acted nervous but was cooperative. Sexton told Detective Wynn that he was getting food.

{¶8} Two minutes after the stop commenced, Detective Wynn returned to his patrol vehicle with Sexton's driver's license. Detective Wynn remained in his patrol vehicle for

approximately four minutes.   During that time, the audio recording reflects that Detective Wynn asked dispatch if there was a K-9 unit available.

{¶9}   Six and one-half minutes after stopping Sexton, Detective Wynn returned to the van.  He asked Sexton whether there was anything illegal in the van and whether he could search the van.  Initially, Sexton was reluctant to respond, parrying the question about searching the van by stating "it's not my vehicle" and "I don't know what's in here."

{¶10}   Detective Wynn indicated it was a "yes or no" question and further stated that it was okay if Sexton did not want to consent to a search, because he could have a K-9 sniff the vehicle instead.  Sexton gave another ambiguous response and so Detective Wynn asked Sexton to step out of the vehicle.  Sexton complied.

{¶11}   Immediately after exiting the van, Sexton told Detective Wynn, "I don't care if you do search it."  Detective Wynn asked once again if it was okay if he searched the van, and Sexton repeated that he did not care.  Sexton gave this consent approximately one minute after Detective Wynn had returned to the van, or approximately seven and one-half minutes into the stop.

{¶12}   By this time, two other police officers had arrived on scene and stood with Sexton outside the van while Detective Wynn conducted his search.   The van was apparently full of clothing, trash, and other items, which complicated Detective Wynn's efforts at searching.

{¶13}   Detective Wynn searched the entire van in approximately 14 minutes.  He found no contraband.  Immediately after completing the search, Detective Wynn turned to Sexton and asked if it would be okay to search him.  Sexton immediately responded that he did not mind.

{¶14}   After searching Sexton's clothing and finding no contraband, Detective Wynn asked Sexton if there was anything in his shoes.  Sexton responded negatively.  Detective

Wynn asked if he would mind removing his shoes so he could check. Sexton complied and Detective Wynn located a small baggie of what appeared to be a crystal substance, allegedly methamphetamine, in one shoe.

{¶15} Detective Wynn then arrested Sexton. The cruiser cam footage indicates that approximately 24 minutes elapsed between the beginning of the traffic stop and Sexton's arrest.

{¶16} On cross-examination, Detective Wynn clarified that he did not have a traffic citation ready for Sexton at the time that he initially returned to the van and asked for consent to search. The court asked Detective Wynn if he could have had a traffic citation prepared in the approximate four minutes he spent inside the patrol vehicle. He answered, "[m]ost likely not, unless I'm just going to go ahead and give a verbal warning. But just doing the preliminary checks, checking with dispatch, then getting back with you – even checking through your computer takes longer than four minutes, without writing the citation." The court then asked Detective Wynn for a rough estimate on how long it would take to run a computer check and then issue a traffic citation. He responded that it would take from seven to ten minutes.

{¶17} The court granted the motion to suppress. The court's written decision did not set forth its rationale but instead referred to the court's comments at the conclusion of the suppression hearing. At the hearing, the court stated that Detective Wynn should have delivered Sexton a traffic citation or otherwise ended the traffic stop upon initially returning to the van. And because he did not, the court considered the continued detention illegal. The court considered various factors to assess the voluntariness of Sexton's consent, including the requirement under *State v. Robinette* that the facts "clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer

further questions and could in fact leave."[1]  After considering the relevant factors, the court found that Sexton had not freely and voluntarily consented.  Specifically, the court noted that it did not find that Sexton would have believed he was free to leave the traffic stop.

{¶18}  The state appeals, raising one assignment of error.  Sexton did not file an appellee's brief or otherwise attempt to defend the court's decision on appeal.

{¶19}  Assignment of Error No. 1:

{¶20}  THE BUTLER COUNTY COURT OF COMMON PLEAS COMMITTED REVERSIBLE ERROR WHEN IT GRANTED APPELLEE'S MOTION TO SUPPRESS.

{¶21}  The state argues that it did not illegally detain Sexton.  Instead, the state contends that Sexton remained legally detained for the turn signal violation at the time Detective Wynn requested consent to search.  And because Sexton was legally detained, the state was not required to prove – as a prerequisite to establishing voluntary consent – that a reasonable person in Sexton's position would believe he had the freedom to refuse to consent to the search and leave the scene.  The state also argues that even if a reasonable time to complete the traffic stop had ended, Detective Wynn possessed a reasonable articulable suspicion that Sexton was involved in drug activity and therefore could extend the detention to investigate his suspicion.

{¶22} Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact.  *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 15, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.  The trial court, as the trier of fact, is in the best position to weigh the evidence to resolve factual questions and evaluate witness credibility.  *State v. Vaughn*, 12th Dist. Fayette No. CA2014-05-012, 2015-Ohio-828, ¶ 8.  Therefore, when reviewing the decision on a motion to

---

1.  80 Ohio St.3d 234, 245 (1997).

suppress, this court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Durham*, 12th Dist. Warren No. CA2013-03-023, 2013-Ohio-4764, ¶14. "An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard." *State v. Cochran*, 12th Dist. Preble No. CA2006-10-023, 2007-Ohio-3353, ¶ 12.

{¶23} "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution prohibit unreasonable searches and seizures, including unreasonable automobile stops." *Bowling Green v. Godwin*, 110 Ohio St.3d 58, 2006-Ohio-3563, ¶ 11. When the police stop a vehicle based on probable cause that a traffic violation has occurred, the stop is reasonable under the Fourth Amendment. *Id.* During a traffic stop, a law enforcement officer may detain a motorist for a period of time sufficient to issue a citation and to perform routine procedures such as a computer check on the motorist's driver's license, registration, and vehicle plates. *State v. Grenoble*, 12th Dist. Preble No. CA2010-09-011, 2011-Ohio-2343, ¶ 28.

{¶24} Although a warrant is ordinarily required for a search to be reasonable under the Fourth Amendment and Ohio Constitution, one exception to the warrant requirement is the consent search. No Fourth Amendment violation occurs when an individual voluntarily consents to a search. *United States v. Drayton*, 536 U.S. 194, 207, 122 S.Ct. 2105 (2002); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041 (1973); *State v. Comen*, 50 Ohio St.3d 206, 211 (1990). Consent to a search is "a decision by a citizen not to assert Fourth Amendment rights." Katz, *Ohio Arrest, Search and Seizure* (2004 Ed.), Section 17:1, at 341.

{¶25} "A police officer's request for consent to search a vehicle stopped for a traffic violation is valid if it is made, and voluntary consent is obtained, during the period of time

reasonably necessary to process the traffic citation * * * in other words, while the driver is lawfully detained for the traffic violation." *State v. Watts*, 2d Dist. Montgomery No. 21982, 2007-Ohio-2411, ¶ 12. "On the other hand, once a traffic citation is issued and the purpose of the original stop is completed, the lawful basis for the detention ceases. If police thereafter seek consent to search the vehicle absent some reasonable, articulable suspicion of criminal activity other than the traffic violation, the continued detention is unlawful." *Id.* citing *State v. Retherford*, 93 Ohio App.3d 586 (2d Dist.1994); *Robinette*, 80 Ohio St.3d 234. "Once an individual has been unlawfully detained by law enforcement, for his or her consent to be considered an independent act of free will, the totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave." *Robinette* at 245, citing *Bustamonte*; *Florida v. Royer*, 460 U.S. 491, 103 S. Ct. 1319 (1983); *State v. Barnes*, 25 Ohio St.3d 203, 208-209 (1986).

{¶26} At the suppression hearing, it was undisputed that the initial traffic stop for a turn signal violation was valid. Thus, Detective Wynn could detain Sexton for the time reasonably necessary to issue a traffic citation, which would include routine procedures such as a computer check on Sexton's driver's license, registration, and vehicle plates. In this case, the only evidence presented to the court as to a reasonably necessary time to run a computer check and write a citation was Detective Wynn's testimony that this process would take seven to ten minutes. The court indicated in its comments at the hearing that it credited Detective Wynn's testimony concerning the time to write a citation.

{¶27} The evidence showed that after a brief conversation, Detective Wynn returned to his vehicle with Sexton's driver's license. Four minutes later, Detective Wynn returned to Sexton's vehicle and asked for consent to search the vehicle. Approximately one minute later, Sexton provided consent. Thus, five minutes passed between the time that Wynn

returned to his patrol vehicle and when Sexton gave consent to search the van. Based on the timeline presented, and even considering the initial conversation between Sexton and Detective Wynn, this court concludes that Detective Wynn requested and obtained consent during the period of time reasonably necessary to process a traffic citation. Accordingly, the trial court erred to the extent it concluded that Sexton was illegally detained at the time that he provided consent.

{¶28} Due to the van's condition, Detective Wynn's search took longer than normal. However, because Sexton provided consent for the search, he implicitly agreed to waive his Fourth Amendment rights and extend the reasonable period necessary to issue a traffic citation for that amount of time necessary for Detective Wynn to complete the search. Upon completing the search of the van, Detective Wynn immediately asked Wynn if he would consent to a search of his person, and ultimately, remove his shoes. Sexton, without hesitation, provided his consent to both requests. Thus, Sexton again waived his Fourth Amendment rights and agreed to extend the stop for the length of time necessary for Detective Wynn to complete these additional searches.

{¶29} This court also concludes that Detective Wynn could have reasonably extended the stop to investigate a reasonable articulable suspicion that Sexton was engaged in drug activity. To possess a reasonable articulable suspicion of criminal activity, a "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" a search and seizure. *State v. Bobo*, 37 Ohio St.3d 177, 178 (1988), quoting *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S.Ct. 1868 (1968). Whether "reasonable articulable suspicion" exists is not measured by a "strict, inflexible standard," rather, "its determination involves a consideration of 'the totality of the circumstances.'" *City of Maumee v. Weisner*, 87 Ohio St.3d 295, 299 (1999), citing *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690 (1981). "Under this analysis, 'both the

content of information possessed by police and its degree of reliability' are relevant to the court's determination." *Id.*, quoting *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412 (1990).

{¶30} Where information possessed by a police officer before a stop stems from an informant's tip, the determination of reasonable suspicion should involve a consideration of the weight and reliability due that tip. *Id.* Relevant factors to assess the reliability of a tip include the informant's "veracity, reliability, and basis of knowledge." *Id.* In reviewing these factors, courts have identified three classes of informants, "the anonymous informant, the known informant (someone from the criminal world who has provided previous reliable tips), and the identified citizen informant." *Id.* at 300. The anonymous informant is comparatively unreliable, and therefore his or her tip "will generally require independent police corroboration." The identified citizen informant, however, is credited with greater reliability, and "a strong showing as to the other indicia of reliability may be unnecessary * * *." *Id.*

{¶31} The record indicates that Detective Wynn was familiar with the multiple complaints of drug activity associated with 507 South Washington. He had first learned of these complaints through direct contact with neighbors at a neighborhood meeting.

{¶32} The neighbor informant who called Detective Wynn was known to Detective Wynn. Detective Wynn had the informant's phone number and could contact him when he wanted. The informant had previously given information to Detective Wynn. The informant relayed what another neighbor was observing at the suspected drug house, which was the driver of a van engaged in suspected drug activity and entering and exiting a suspected drug house. The observed activity was consistent with other suspected drug activity at the residence.

{¶33} Detective Wynn responded to the location and observed a van leaving the scene, which observation corroborated the informant's tip. Then, Detective Wynn was able

to obtain further corroboration by calling the neighbor who had observed the van and confirming that the van that Detective Wynn observed was the same van parked outside of 507 South Washington.

{¶34} Given the active investigation into drug complaints occurring at 507 South Washington, the identified citizen informants who supplied Detective Wynn with information concerning Sexton's activities in conjunction with that residence, and Sexton's nervous behavior, this court concludes that Detective Wynn possessed a reasonable articulable suspicion that Sexton was involved in drug activity. Accordingly, even if the time for writing a traffic citation had expired, Detective Wynn could have reasonably extended the traffic stop for the purpose of asking Sexton whether the van contained narcotics and whether he could search the van.

{¶35} With respect to the voluntariness of Sexton's consent, this court concludes that the state was not – as a prerequisite to establishing voluntary consent – required to clearly demonstrate that Sexton would believe that he had the freedom to refuse to consent and could in fact leave the traffic stop. Unlike *Robinette*, the traffic stop had not ended when Detective Wynn asked for consent. Sexton was legally detained for the traffic stop when Detective Wynn asked for consent and Sexton could not leave the stop at that time. Nonetheless, the state was still required to demonstrate that consent was freely and voluntarily given "and not the result of duress or coercion, express or implied." *Bustamonte*, 412 U.S. at 248.

{¶36} Considering the remaining relevant factors, the lower court found that Detective Wynn did not act coercively.[2] This court agrees. Detective Wynn's statement

---

2. The factors relevant to determining whether consent is voluntary include "(1) the suspect's custodial status and the length of the initial detention; (2) whether the consent was given in public or at a police station; (3) the presence of threats, promises, or coercive police procedures; (4) the words and conduct of the suspect; (5) the extent and level of the suspect's cooperation with the police; (6) the suspect's awareness of his right

that he would request a K-9 was truthful, as he had in fact requested a K-9 officer on scene. Moreover, an officer may conduct a canine sniff of a vehicle during the time required to effectuate a traffic stop. *State v. Casey*, 12th Dist. Warren No. CA2013-10-090, 2014-Ohio-2586, ¶ 22. The only other relevant factor considered by the court was Sexton's cooperativeness, and the court concluded that Sexton was not cooperative. Thus, with the exception of knowledge of his right not to consent, all relevant factors considered by the court favored the voluntariness of consent. Sexton failed to file a brief and thus we have no argument before us to the contrary.

{¶37} Detective Wynn did request that Sexton leave the van immediately prior to the time that Sexton granted consent. However, Sexton was not placed in handcuffs or otherwise restrained. A review of the cruiser cam footage and the totality of circumstances supports the conclusion that Sexton freely and voluntary consented to a search of the van and later, without any apparent concern, provided consent to search his person. Based upon the foregoing, this court sustains the state's sole assignment of error, reverses the decision of the trial court, and remands the matter for further proceedings.

{¶38} Judgment reversed and remanded.

M. POWELL, P.J., and S. POWELL, J., concur.

---

to refuse to consent and his status as a 'newcomer to the law;' and (7) the suspect's education and intelligence." *State v. Christopher*, 12th Dist. Clermont No. CA2009-08-041, 2010-Ohio-1816, ¶ 45, citing *Bustamonte* at 248-249.