[Cite as *State v. Shaibi*, 2021-Ohio-1352.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellant, | : | CASE NO. CA2020-07-038 |
| | : | O P I N I O N |
| - vs - | | 4/19/2021 |
| | : | |
| FADEL SHAIBI, | : | |
| Appellee. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 20CR36388

David P. Fornshell, Warren County Prosecuting Attorney, Kirsten A. Brandt, 520 Justice Drive, Lebanon, Ohio 45036, for appellant

Henderson, Mokhtari & Weatherly, Brandon J. Henderson, Justin M. Weatherly, 1231 Superior Avenue East, Cleveland, Ohio 44114, for appellee

**HENDRICKSON, J.**

{¶ 1} Appellant, the state of Ohio, appeals from a decision of the Warren County Court of Common Pleas granting a motion to suppress filed by appellee, Fadel Shaibi (hereafter, "Shaibi"). For the reasons discussed below we affirm the trial court's decision.

{¶ 2} On January 21, 2020, Shaibi was indicted on one count of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(2) and (C)(1)(c) and one count of

aggravated possession of drugs in violation of R.C. 2925.11(A) and (C)(1)(b), both felonies of the third degree as the amount of drug involved (Cathinone, a Schedule I drug) equaled or exceeded the bulk amount but was less than five times the bulk amount. Shaibi was also indicted on one count of trafficking in drugs in violation of R.C. 2925.03(A)(2) and (C)(2)(a), a felony of the fifth degree as the drug involved (Cathine, a Schedule IV drug) was in an amount less than the bulk amount, and one count of possession of drugs in violation of R.C. 2925.11(A), a misdemeanor of the first degree. The charges arose out of a traffic stop and subsequent search of a rented U-Haul truck traveling northbound on I-71 in Warren County, Ohio. Shaibi was a passenger in the truck, which was being driven by his cousin Sanad Shaibi (hereafter, "Sanad").

{¶ 3} Shaibi pled not guilty to the charges and moved to suppress evidence obtained from the search of the U-Haul truck, contending that the initial stop of the vehicle was not supported by probable cause or reasonable and articulable suspicion. He further argued that law enforcement unconstitutionally prolonged his detention during the stop and that any consent he gave for the search of the truck was not voluntarily given under the circumstances.

{¶ 4} On May 21, 2020, a hearing was held on Shaibi's motion to suppress. At the hearing, the state presented testimony from Ohio State Highway Patrol ("OSHP") Trooper Kyle Doebrich and introduced into evidence video footage of the stop, which had been captured on the trooper's cruiser's camera. Trooper Doebrich testified that he has been employed as a trooper with OSHP for seven years and is currently assigned to the interdiction unit. Trooper Doebrich has specific training in the use of speed detection equipment, such as laser and radar speed devices, and has also been trained in pacing and visual observation of speed. Additionally, Trooper Doebrich has received advanced training in drug interdiction, criminal interdiction, and trafficking, and he has worked with the

ATF, DEA, FBI, Warren County's Drug Task Force, Hamilton County's Drug Task Force, and with the city of Cincinnati's Police Investigation Unit.

{¶ 5} On October 23, 2019, Trooper Doebrich was in uniform in a marked police cruiser on I-71. At approximately, 12:10 p.m., as the trooper was sitting stationary near mile post 36 in Warren County, Ohio, he observed a U-Haul truck driven by Sanad traveling northbound. The trooper found the manner in which the truck decreased its speed as it approached his cruiser suspicious. Trooper Doebrich pulled his cruiser onto the highway and pursued the truck. As he was catching up to the truck, the trooper visually observed that the truck was exceeding the 70-m.p.h. speed limit. Trooper Doebrich paced the truck for approximately 20 seconds as the truck traveled 80 m.p.h. During this time, the trooper also noticed that the truck was following another vehicle too closely. Based on these observations, at 12:13 p.m., Trooper Doebrich initiated a traffic stop of the vehicle.

{¶ 6} Once the U-Haul truck pulled over, Trooper Doebrich gave his dispatch the truck's Arizona license plate number before approaching the truck on its passenger side. Immediately upon approaching the truck, the trooper noted that Shaibi, who was sitting in the passenger seat, appeared nervous. Shaibi was breathing fast, his hands were shaking, and he would not make eye contact with the trooper. Trooper Doebrich testified that Shaibi's behavior was "quite unusual to see out of a passenger in a motor vehicle."

{¶ 7} The driver of the truck, Sanad, was argumentative and denied that he was speeding. Trooper Doebrich testified it was uncommon to have a driver deny an infraction, and he stated that it was "a tool people use to thwart our ability to get themselves out of a citation or have contact with us." While talking with Sanad and Shaibi, the trooper observed a large bag of jewelry in a plastic shopping bag sitting in the cab of the truck. The trooper found the bag of jewelry "odd" and suspicious as it was possible it had been stolen since it was packaged in bulk and there did not appear to be receipts.

{¶ 8} Trooper Doebrich asked for the men's identification and to see the rental agreement for the U-Haul. In the trooper's experience, U-Haul provides renters with a link to an electronic copy of the rental agreement. Shaibi was able to produce a New York driver's license and claimed that he had rented the U-Haul, though he was unable to provide the trooper with a copy of the rental agreement at this time. Sanad informed the trooper that he had a New York driver's license, but he did not have the ID on him as he had left it in Cincinnati.

{¶ 9} The trooper had Sanad exit the truck and after patting Sanad down, placed him in the back of the cruiser. As Sanad claimed to have a New York license, Trooper Doebrich was unable to confirm Sanad's identity on his cruiser's computer and had to call in the information to an OSHP intel analyst. At 12:19 p.m., Sanad provided Trooper Doebrich with his name, date of birth, and social security number. Sanad appeared to be somewhat unsure of his social security number when he provided it, which the trooper found to be suspicious.

{¶ 10} After obtaining Sanad's identifying information, the trooper questioned Sanad about his and Shaibi's travels and their final destination. Sanad informed the trooper that he and Shaibi were cousins and were on their way to Buffalo, New York, after being in Cincinnati for business. Sanad told the trooper that his and Shaibi's family operated a business that sold hair and beauty supplies. They had one store in Cincinnati and a second store in Buffalo. Trooper Doebrich testified that both Buffalo and Cincinnati are "source cities," which he explained are "[l]arge hubs, criminal and drug activity. * * * Highways are a road commonly used to transport narcotics, currency, and contraband. Those are all significant locations."

{¶ 11} Trooper Doebrich questioned Sanad about why Cincinnati was selected as a store location, and Sanad "had hesitation and was unsure about the reason" before

ultimately stating "something to the fact of it just seemed like a good place or something." The trooper found it odd that Sanad "had no real certain reason why they would have business in Cinci[nnati]." The trooper also found it odd and suspicious that Sanad had "hesitation and pause in his voice" when identifying Shaibi and another cousin as the owners of the family business. According to Trooper Doebrich, "[I]f he's working for a company and it's a family business, typically names of family members are fairly quick to respond to." The trooper was also suspicious when Sanad struggled to identify the address of where the Cincinnati store was located, even though Sanad claimed to have just come from Cincinnati. When asked about the address, Sanad stated it was "Kemper." When Trooper Doebrich asked if it was Kemper Road, Sanad said "yes," but was unable to confirm the exact address.

{¶ 12} At 12:24 p.m., Trooper Doebrich contacted an OSHP intel analyst to obtain a record's check on Sanad and Shaibi. The trooper requested both a record check of the New York identifications and an El Paso Intelligence Center ("EPIC") check for both men. Trooper Doebrich explained that an EPIC check is not something that he can obtain immediate results from as it "takes some time," to obtain the information but he nonetheless felt, "based on the suspicious – the nervous behavior and the observations [he] made" that it was best to request the information as he had "suspicion that there is possible drug activity afoot."[1]

---

1. The trooper did not provide any further details on what information he expected to obtain from the EPIC check. "The El Paso Intelligence Center (EPIC) was established in 1974, to provide tactical intelligence to federal, state, and local law enforcement agencies on a national scale. Staffed by representatives of the DEA and the INS, EPIC has since expanded into a center comprised of 21 participating agencies that share a common quest: identify threats to the Nation, with an emphasis on the Southwest border." United States Drug Enforcement Administration, *El Paso Intelligence Center*, https://www.dea.gov/el-paso-intelligence-center-epic (accessed March 9, 2021). "EPIC's mission is 'to support U.S. law enforcement (LE) through the timely analysis and dissemination of intelligence on threats to the Nation and those criminal organizations responsible for illegal activities within the Western Hemisphere, having a particular emphasis on Mexico and the Southwest Border.' While taking a hemispheric, all crimes/all threats view, **EPIC's primary focus is on criminal activity *within* the United States.**" (Emphasis sic.) United States Drug Enforcement Administration, *EPIC's Mission*, https://www.dea.gov/epics-mission (accessed March 9, 2021).

{¶ 13} Trooper Doebrich testified that he received a "quick response" from the intel analyst verifying Sanad's New York identification. By 12:28 p.m., both Sanad and Shaibi's identification had been verified. From 12:28 p.m. until 12:31 p.m., Trooper Doebrich continued speaking with Sanad, asking him additional questions about the Buffalo and Cincinnati beauty stores, his travels, and the contents of the U-Haul. During this time, Sanad informed the officer that he and Shaibi were originally from Yemen, that he moved to the United States in 2003, and that he had recently returned from an overseas trip to Yemen. Sanad stated that Shaibi had rented the U-Haul truck and that they were bringing back Ikea furniture they had bought for their homes in New York. Sanad also clarified for the trooper that this was his first trip to Cincinnati.

{¶ 14} At 12:32 p.m., Trooper Doebrich exited his cruiser and reapproached Shaibi in the rental truck. Trooper Doebrich testified that at the time he reapproached Shaibi, he was hoping to confirm the rental agreement for the U-Haul and he was "still waiting on some information" from the intel analyst about both occupants of the U-Haul. Specifically, Trooper Doebrich testified he was waiting on the results of the EPIC check and waiting to receive a photograph of Sanad. Trooper Doebrich's testimony about waiting on a photograph, however, conflicts with statements he made to the intel analyst. On the recording of the traffic stop, the analyst can be heard asking Trooper Doebrich whether he wanted a photograph of Sanad and Doebrich responded, "No. I just need to see if you can just pull it up. I've got the soc[ial], name, and DOB." In any event, Trooper Doebrich testified that at the time he concluded his initial phone call with the intel analyst, before reapproaching Shaibi in the U-Haul, he had all the information he needed to write Sanad a traffic citation for speeding and following too closely.

{¶ 15} Upon encountering Shaibi for the second time, Trooper Doebrich observed that Shaibi maintained his nervous behavior. He did not make eye contact, his hands were

shaking, and he was rapidly breathing – "all things consistent with an adrenaline rush based on fear." The trooper found Shaibi's behavior unusual, as Shaibi was a passenger and not the individual who had committed the traffic violations and therefore would not be issued a traffic citation. Shaibi was able to pull up an electronic copy of the U-Haul's rental agreement and he provided the agreement to the trooper after exiting the U-Haul at the trooper's request. Shaibi was not subjected to a pat down by the trooper after he exited the U-Haul.

{¶ 16} While Shaibi was providing the rental agreement, Trooper Doebrich questioned Shaibi about the jewelry in the cab of the truck. Shaibi informed the trooper that the jewelry was for his business. Trooper Doebrich asked to view the jewelry. Shaibi handed the jewelry over and gave the trooper permission to open the bag. Shaibi told the trooper that he purchases the jewelry for a small fee, around $2.50 apiece, and sells the jewelry for between $5.00 and $6.00 apiece. Following Shaibi's explanation and the trooper's visual inspection of the jewelry, Trooper Doebrich indicated most of his suspicions regarding the jewelry were dispelled and the presence of the jewelry did not lead to a suspicion of drug activity.

{¶ 17} Despite having confirmed the men's identities, that there was a rental agreement for the U-Haul truck, and the inexpensive nature of the jewelry in the truck, Trooper Doebrich continued to detain Shaibi. Trooper Doebrich questioned Shaibi about his business and travel plans, and Shaibi gave answers that were largely consistent with Sanad's answers concerning those subjects.[2] Shaibi explained that he was originally from

---

2. In an effort to clarify whether there were inconsistencies in Shaibi's and Sanad's stories, the trial court questioned Trooper Doebrich as follows:

> THE COURT: Okay, but then when you compare what Sanad told you to what the defendant [Shaibi] told you, were those inconsistent with each other?

Yemen, that he operated beauty supply stores in Buffalo and Cincinnati, and that he and Sanad were transporting IKEA furniture for their respective homes in the back of the U-Haul. Shaibi also indicated he was transporting "hair stuff."

{¶ 18} Trooper Doebrich felt that there was the "potential" that Shaibi and Sanad were engaged in some criminal activity, though he had no idea what criminal activity had occurred. At 12:35 p.m., or 22 minutes into the traffic stop, Trooper Doebrich asked Shaibi for permission to search the rear of the truck. Shaibi, who was not told he had the right to refuse the trooper's request, produced a key to the padlock of the truck. At 12:36 p.m., while Sanad remained secured in the back of the trooper's cruiser, the back of the U-Haul is opened. At this time, Trooper Roddy, a canine handler, arrived on scene.

{¶ 19} While standing outside the back of the opened U-Haul, Trooper Doebrich observed a large number of boxes arranged in a haphazard fashion. Some of the boxes were labeled "IKEA" and some of the boxes had shipping labels. Trooper Doebrich thought the load was irregular and somewhat suspicious as it was a "mixed load" and possibly a "cover load" for the transportation of contraband.[3] There was a duffel bag in rear of the

---

[TROOPER DOEBRICH]: They were consistent while speaking with both of them and processing those conversations together.

3. With respect to the load irregularities he observed, Trooper Doebrich explained as follows:

[PROSECUTOR]: You said load irregularities. I'm assuming what the contents of the back of the U-Haul were?

[TROOPER DOEBRICH]: Yes, sir.

[PROSECUTOR]: What was so unusual or what do you mean by that?

[TROOPER DOEBRICH]: With that being said, initially was understood to me both that it was a personal load of merchandise and then it turned into a business/personal and then both parties had items and the load had hair supplies [sic] items and also their clothing items and then miscellaneous bags, which were the two bags that I observed.

[PROSECUTOR]: Is there something unusual about that, based on your training and experience?

truck and Shaibi consented to the search of the bag. Inside the bag, Trooper Shaibi found Shaibi's clothing and personal effects. The trooper also observed a plastic bag in the left rear corner of the truck, which appeared to contain papers, receipts, miscellaneous items and another plastic bag containing a green plant material that the trooper believed was contraband. Based on his training and experience, Trooper Doebrich believed the green plant material was "Khat," a drug the trooper stated was "common" from a country such as Yemen. Trooper Doebrich questioned Shaibi about the green plant material, and he originally claimed it was tea before admitting it was Khat. At the time Trooper Doebrich searched the back of the U-Haul and discovered the Khat, he had not received the results of the EPIC check or obtained a photograph of Sanad from the intel analyst.

{¶ 20} After hearing the foregoing testimony, the trial court took the matter under advisement. The state filed a memorandum in opposition to Shaibi's motion to suppress, arguing Trooper Doebrich had reasonable and articulable suspicion to stop and detain the occupants of the U-Haul and he had received consent to search the U-Haul. On July 7, 2020, the trial court issued a decision granting Shaibi's motion to suppress, holding that "any and all evidence gained following the obtaining [of] the electronic copy of the rental agreement and the Defendant responds [sic] as to the nature of his business (approximately 12:35 on Exhibit 1) is hereby suppressed – including, but not limited to the suspected illegal drugs." The court determined that the initial stop of the U-Haul was lawful as it was based on probable cause that traffic violations, specifically speeding and following too closely, had occurred. The court further found that the detention of Shaibi and Sanad to verify Sanad's identity, to obtain a copy of the rental agreement, and to dispel concerns about the jewelry

---

[TROOPER DOEBRICH]: Yes, sir. I mean in a commercial business, typically things are nowadays sent directly to stores. It's more money now to send things from location to location. It would be common to have things sent directly where you need them in the quantity you need them. That's common for business.

observed in the truck of the U-Haul were reasonable under the circumstances. However, "once the issue of the rental agreement and suspicious jewelry [were] dispelled, the Trooper ha[d] nothing other than a general, unspecified suspicion of the 'potential of criminal activity' and [Shaibi's] nervous behavior" as a basis for prolonging the detention. The court concluded that

> [a]t the time he asks to view the items in the rear of the vehicle, the Trooper has no legal authority to continue the detention. It is apparent from Exhibit 1 that this traffic stop is going to continue indefinitely until the Trooper finds evidence of a crime. Such is the essence of a "fishing expedition" and does not withstand constitutional scrutiny where the basis of the stop boils down to little more than two nervous men of middle eastern descent driving a rented truck containing some unusual personal items.
>
> Therefore, the Court concludes that the Trooper's continued detention of [Shaibi], after identifying the driver, viewing the rental agreement and allaying the concerns regarding the jewelry, is unreasonable and not based on any articulable facts giving rise to the suspicion of illegal activity. The Court further finds that the consent of [Shaibi], because it was obtained after a period of detention longer than is constitutionally permitted, is invalid.

{¶ 21} The state appealed the trial court's decision, raising the following as its sole assignment of error:

{¶ 22} THE TRIAL COURT ERRED WHEN IT GRANTED APPELLEE'S MOTION TO SUPPRESS.

{¶ 23} The state argues the trial court erred in granting Shaibi's motion to suppress as the evidence presented at the suppression hearing demonstrated that the traffic stop was not unreasonably prolonged beyond the initial purpose for the stop. Alternatively, the state contends that even if it was prolonged, there were "specific and articulable facts which reasonably warranted continuing the detention up to and even after the discovery of Khat in the rear of the U-Haul." The state argues that Shaibi's consent to search the rear of the

U-Haul "was provided during a lawful detention, and his consent was freely and voluntarily given without any duress or coercion from the trooper."

{¶ 24} "Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact." *State v. Turner*, Slip Opinion No. 2020-Ohio-6773, ¶ 14, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. The trial court, as the trier of fact, is in the best position to weigh the evidence to resolve factual questions and evaluate witness credibility. *State v. Vaughn*, 12th Dist. Fayette No. CA2014-Ohio-05-012, 2015-Ohio-828, ¶ 8. Therefore, when reviewing a trial court's decision on a motion to suppress, this court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *Turner* at ¶ 14. "An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard." *State v. Cochran*, 12th Dist. Preble No. CA2006-10-023, 2007-Ohio-3353, ¶ 12.

{¶ 25} "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution prohibit unreasonable searches and seizures, including unreasonable automobile stops." *Bowling Green v. Godwin*, 110 Ohio St.3d 58, 2006-Ohio-3563, ¶ 11. "When a defendant files a motion to suppress alleging the traffic stop constituted an unlawful seizure, 'the state bears the burden of demonstrating the validity of [the] traffic stop.'" *State v. Turner*, 12th Dist. Clermont No. CA2018-11-082, 2021-Ohio-541, ¶ 11, quoting *State v. Bui*, 6th Dist. Lucas No. L-19-1028, 2021-Ohio-362, ¶ 29. Similarly, "[o]nce a warrantless search is established, the burden of persuasion is on the state to show the validity of the search." *Xenia v. Wallace*, 37 Ohio St.3d 216, 218 (1988), citing *State v. Kessler*, 53 Ohio St.2d 204, 207 (1978). "This flows from the presumption that searches conducted outside the judicial process, without prior approval by judge or

magistrate, are "*per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions.'" *Id.*, quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 454-455, 91 S.Ct. 2022 (1971).

{¶ 26} It is well established that when the police stop a vehicle based on probable cause that a traffic violation has occurred, the stop is reasonable under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769 (1996); *Dayton v. Erickson*, 76 Ohio St.3d 3 (1996), syllabus; *Godwin* at ¶ 11. "During a traffic stop, a law enforcement officer may detain a motorist for a period of time sufficient to issue a citation and to perform routine procedures such as a computer check on the motorist's driver's license, registration, and vehicle plates." *State v. Hill*, 12th Dist. Warren No. CA2015-05-044, 2015-Ohio-4655, ¶ 8, citing *State v. Grenoble*, 12th Dist. Preble No. CA2010-09-11, 2011-Ohio-2343, ¶ 28. *See also Rodriguez v. United States*, 575 U.S. 348, 355, 135 S.Ct. 1609 (2015). "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.' * * * Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed." *Id.* at 354, quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319 (1983).

{¶ 27} However, the detention of a stopped motorist "may continue beyond [the normal] time frame when additional facts are encountered that give rise to a reasonable, articulable suspicion of criminal activity beyond that which prompted the initial stop." *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, ¶ 15. Where reasonable and articulable suspicion of criminal activity exists, "[t]he officer may detain the vehicle for a period of time reasonably necessary to confirm or dispel his suspicions of criminal activity." *State v. Williams*, 12th Dist. Clinton No. CA2009-08-014, 2010-Ohio-1523, ¶ 18.

**Traffic Stop - EPIC Check and Sanad's Photograph**

{¶ 28} In the present case, Trooper Doebrich observed Sanad commit two traffic

violations – speeding and following another vehicle too closely – which gave him probable cause to effectuate a traffic stop. Once stopped, the trooper was permitted to detain Sanad and Shaibi for that period of time necessary to issue the traffic citations to Sanad. As Sanad could not present his driver's license, Trooper Doebrich was entitled to detain him to verify that Sanad had a valid license and to conduct "ordinary inquiries incident to [the traffic] stop." *Illinois v. Caballes*, 543 U.S. 405, 408, 125 S.Ct. 834 (2005).

{¶ 29} The state contends that part of the "ordinary inquiries" incident to the traffic stop included obtaining a photograph of Sanad and the results of the EPIC check for both men. As those items had not been received at the time Trooper Doebrich reapproached Shaibi and requested consent to search the U-Haul truck, the state argues the traffic stop was not prolonged beyond the time needed to issue the citation.

{¶ 30} Typically, "ordinary inquiries" incident to a traffic stop "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.*

{¶ 31} Contrary to the state's arguments, the EPIC check requested by Trooper Doebrich was not an ordinary traffic stop inquiry as it was not related to the mission of the traffic stop. While "[a]n officer * * * may conduct certain unrelated checks during an otherwise lawful traffic stop * * * he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* Though the state attempts to equate an EPIC check with a standard background check, the trooper's testimony from the motion to suppress hearing suggests otherwise. In his limited testimony about the EPIC check, Trooper Doebrich explained that it is something that cannot be accessed immediately as it "takes some time" to obtain the information from an outside

agency and the information was not needed to issue the traffic citations. Furthermore, the state's brief does not advance any reason or reference any testimony from the suppression hearing explaining how the EPIC check was related to the enforcement of the traffic code and ensuring that the U-Haul truck was being operated safely and responsibly. Accordingly, the EPIC check was not an inquiry incident to the traffic stop and the prolonged detention of Shaibi to await receipt of the EPIC check results, therefore, had to be supported by reasonable articulable suspicion.

{¶ 32} The state also argues that Shaibi's continued detention was justified while Trooper Doebrich awaited receipt of a photograph of Sanad. Presumably, this was to confirm Sanad's identity. However, the record does not reflect that there was any concern about the reliability of the identifying information that Sanad provided to the trooper or any concern about the information related by the intel analyst after running Sanad's information and verifying Sanad's New York license. Though the dissent posits that even after verifying Sanad's name, date of birth, social security number, and valid New York driver's license with the intel analyst, Trooper Doebrich still needed to "confirm whether the driver was, in fact, the person he * * * said [he was]." However, neither the recording of the traffic stop nor the trooper's testimony supports this theory. The trooper never indicated that he doubted Sanad's identity. Additionally, when asked by the intel analyst if the trooper wanted a photograph of Sanad when Sanad's identifying information was initially run, Trooper Doebrich responded, "No. I just need to see if you can just pull it up."[4] Therefore, there is

_____

4. The dissent attempts to tie the EPIC check to Trooper Doebrich's ability to see a photograph of Sanad and theorizes that the trooper may have wanted to view the photograph because of Sanad's hesitation in reciting his social security number, as this "could easily have been an indication [Sanad] was using someone else's identifying information." However, there was no testimony offered by the trooper indicating that (1) the officer was concerned about Sanad's identity or (2) that the results of the EPIC check would include a picture of Sanad or otherwise act to verify Sanad's identity. The state bears the burden of presenting evidence demonstrating the validity of a warrantless seizure or search. *Xenia v. Wallace*, 37 Ohio St.3d 216, 218 (1988). If the trooper had concerns about Sanad's identity and needed to prolong the stop to investigate

- 14 -

no justification for the trooper's continued detention to await a photograph of Sanad. Lest there be any doubt that Sanad's photograph or the results of the EPIC check were unnecessary to complete the traffic stop, Trooper Doebrich testified that by the time he exited his cruiser after speaking with Sanad and returned to the U-Haul truck to speak with Shaibi, he had everything he needed to complete the traffic citation and only wanted to confirm the U-Haul's rental agreement.

{¶ 33} It is the state's burden and legal requirement to justify the need for the EPIC check and Sanad's photograph if the items are going to be relied upon to prolong Shaibi's detention. As the record does not reflect the justification for the EPIC check and the necessity of a photograph of Sanad, they may not serve as the basis for Shaibi's continued detention beyond the time necessary to complete the routine tasks associated with issuing a traffic citation.

**Prolonged Detention**

{¶ 34} Although Shaibi was detained beyond the time necessary to complete the purpose of the traffic stop, that does not end the inquiry of whether the prolonged detention violated the Fourth Amendment. As stated above, the detention of a stopped motorist "may continue beyond [the normal] time frame when additional facts are encountered that give rise to a reasonable, articulable suspicion of criminal activity beyond that which prompted the initial stop." *Batchili*, 2007-Ohio-2204 at ¶ 15.

{¶ 35} "Reasonable articulable suspicion exists when there are specific and articulable facts which, taken together, with rational inferences from those facts, reasonably warrant the intrusion." *Hill*, 2015-Ohio-4655 at ¶ 10, citing *State v. Bobo*, 37 Ohio St.3d 177, 178 (1988). "The 'reasonable and articulable' standard applied to a prolonged traffic

---

whether a false identity had been used, it was incumbent upon the state to present such evidence. This court cannot and will not assume facts not in the record.

stop encompasses the totality of the circumstances, and a court may not evaluate in isolation each articulated reason for the stop." *Batchili* at paragraph two of the syllabus, applying *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744 (2002). Reasonable and articulable suspicion is determined by evaluating the totality of the circumstances "through the eyes of a reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Popp*, 12th Dist. Butler No. CA2010-05-128, 2011-Ohio-791, ¶ 13. "Reasonable suspicion is more than an ill-defined hunch; it must be based on a 'particularized and objective basis for suspecting the particular person * * * of criminal activity.'" *State v. Hunter*, 151 Ohio App.3d 276, 2002-Ohio-7326, ¶ 31 (9th Dist.), quoting *United States v. Cortez*, 449 U.S. 411, 417-418, 101 S.Ct. 690 (1981). *See also State v. Martin*, 12th Dist. Fayette No. CA2012-06-020, 2013-Ohio-1846, ¶ 13.

{¶ 36} The trial court found, and we agree, that Trooper Doebrich had reasonable and articulable suspicion to prolong the traffic stop in order to view the U-Haul rental agreement and dispel his suspicions about the jewelry found in the bed of the truck. However, once the trooper verified that the U-Haul was lawfully rented and that the jewelry was inexpensive costume jewelry related to Shaibi's business, the trial court determined that the trooper had no legal authority to continue the detention of Shaibi as the trooper "ha[d] nothing other than a general, unspecified suspicion of 'potential criminal activity' and nervous behavior." The state disagrees with the trial court's finding, arguing that the following facts gave rise to reasonable and articulable suspicion of criminal activity justifying Shaibi's continued detention: (1) the initial "nervous driving behavior" of the U-Haul truck in slowing down upon approaching the trooper's stationary position on the interstate; (2) Shaibi's nervousness, which continued throughout the duration of the stop and was unusual given that he was a passenger who had not committed the traffic violations that led to the traffic stop; (3) Sanad's argumentative behavior and denial of speeding; (4) the vehicle

Shaibi and Sanad were traveling in was a rental truck, which the trooper testified is commonly "stolen, miss-rented and then used for other purposes;" (5) the U-Haul truck was operating on a major drug highway corridor and was traveling from Cincinnati to Buffalo, two "source cities" for drug and criminal activity; (6) Sanad seemed unsure of his social security number when providing it to the trooper; (7) Sanad had some hesitancy in answering Trooper Doebrich's questions about why Cincinnati was chosen as a location for the family business, where exactly the Cincinnati store was located, and which family members owned the business; and (8) Shaibi stated that the U-Haul contained IKEA furniture for his and his cousin's personal use and then later added it also had inventory ("hair stuff") for his beauty supply business. Relying on these factors, and citing to our previous decisions in *State v. Hill*, 2015-Ohio-4655; *State v. Stephenson*, 12th Dist. Warren No. CA2014-05-073, 2015-Ohio-233; *State v. Kilgore*, 12th Dist. Butler No. CA98-09-201, 1999 Ohio App. LEXIS 2985 (June 28, 1999); and the Third District's decision in *State v. Gibson*, 3d Dist. Allen No. 1-15-22, 2015-Ohio-3812, the state contends there was reasonable and articulable suspicion to prolong the traffic stop for the trooper to investigate.

{¶ 37} In *State v. Hill*, we upheld the trial court's denial of a motion to suppress after determining that under the totality of the circumstances, there was reasonable and articulable suspicion for law enforcement to extend the traffic stop and conduct a canine search of a motor vehicle. *Hill* at ¶ 13. There, continued detention of the vehicle was lawful where the vehicle was driving on a known drug corridor, neither the driver nor the passenger-defendant were listed on the rental agreement for the vehicle, and the passenger was nervous and refused to maintain eye contact with the officer. *Id.*

{¶ 38} In *State v. Stephenson*, we upheld the trial court's denial of a motion to suppress after determining that under the totality of the circumstances, there was reasonable and articulable suspicion of drug-related activity to extend the duration of a

traffic stop and to call a canine unit. *Stephenson* at ¶ 23. The officer had pulled over the vehicle in which the defendant was a passenger after observing the driver commit a traffic violation and observing that the driver and the defendant drove by the officer while "staring straight ahead" with "rigid postures" and with the driver having his arms "locked out." *Id.* at ¶ 3, 23. In addition to this uncommon posture and behavior, the occupants of the vehicle were nervous and the defendant refused to make eye contact with the officer, the driver was unable to produce the vehicle's registration or proof of insurance, the vehicle was traveling from Georgia to Ohio on I-71 – a known drug corridor, the occupants provided inconsistent stories to the officer regarding the purpose of their trip, the length of their stay, and how long they had been friends, and the short duration of the men's stay in Ohio was suspicious given the amount of time it took to drive to and from Georgia. *Id.* at ¶ 23.

{¶ 39} In *State v. Kilgore*, we upheld the trial court's denial of a motion to suppress after concluding that an officer had reasonable articulable suspicion to extend a traffic stop where the officer observed that the driver of the motor vehicle was extremely nervous, his answers to questions concerning his travel origin and destination were internally conflicting and also conflicted with answers provided by his passenger, and both the origin and destination cities of the defendant's travels were known drug locations. *Kilgore*, 1999 Oho App. LEXIS 2985 at *6.

{¶ 40} In *State v. Gibson*, the Third District upheld the trial court's denial of a defendant's motion to suppress after determining that under the totality of the circumstances, an officer had reasonable suspicion to prolong a traffic stop to investigate drug-related activity. *Gibson*, 2015-Ohio-3812 at ¶ 19-23. Upon initiating a traffic stop, the officer discovered that the defendant-driver was not listed as an authorized driver on the vehicle's rental agreement, he was traveling on I-75 from Detroit, Michigan, a known distribution center, to Charleston, South Carolina, a known user city, and he was unable to

provide consistent answers to several of the officer's background questions. *Id.* at ¶ 20-21. These facts, combined with the driver's growing nervousness during the stop, provided the officer with the authority to detain the driver beyond the time period necessary to issue a warning for speeding. *Id.* at ¶ 23.

{¶ 41} The case before us shares some of the same circumstances present in the cases cited and relied on by the state, including the suspicious manner in which the U-Haul truck drove by Trooper Doebrich (the truck's drop in speed as it approached the trooper's stationary position), the fact that the rented U-Haul was being driven on a major drug corridor to and from "source cities," and Shaibi's nervousness during the traffic stop. However, unlike the cases relied on by the state, the U-Haul involved in the present case was properly rented in Shaibi's name and Shaibi's and Sanad's accounts of their travels, dealings in Ohio, and U-Haul cargo were substantially consistent. Additionally, in the present case, there were no other unusual aspects of Sanad's and Shaibi's travels or statements to the trooper that raised the suspicion of criminal activity, such as driving a great distance for an abbreviated stay or forgetfulness of where they were traveling. *Compare with Stephenson* at ¶ 6-7.

{¶ 42} As we previously stated, under the reasonable and articulable standard applied to a prolonged traffic stop, the totality of the circumstances relied on by the officer must be considered together, rather than evaluating each articulated reason for the prolonged stop in isolation from the others. *State v. Batchili*, 2007-Ohio-2204 at paragraph two of the syllabus. Interstate 71, like all interstate highways, has been characterized as a "major drug corridor." However, not all individuals traveling on I-71 are engaged in drug activity. Furthermore, Shaibi's nervousness, as observed by Trooper Doebrich, is not a reliable factor of criminal activity. Though the fact that Shaibi was a passenger may elevate the suspicion surrounding his nervousness, we have previously found that nervousness "'is

an unreliable indicator, especially in the context of a traffic stop.'" *State v. Casey*, 12th Dist. Warren No. CA2013-10-090, 2014-Ohio-2586, ¶ 26, quoting *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir.2004). These factors – driving on an interstate highway and Shaibi's nervousness in the presence of law enforcement – must be viewed in the context of the remaining circumstances surrounding the stop. The question is whether the other factors, when looked at in combination with the U-Haul truck's presence on I-71 and Shaibi's nervousness, reasonably warrant further detention on the basis of suspected criminal activity. "A 'series of acts, each of them perhaps innocent,' may nonetheless, when viewed together, give the police officer justification for conducting further investigation." *State v. Ramey*, 129 Ohio App.3d 409, 414 (1st Dist.1998), quoting *United States v. Sokolow*, 490 U.S. 1, 9-10, 109 S.Ct. 1581 (1989). "'[T]he relevant inquiry is not whether the particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts.'" *Gibson*, 2015-Ohio-3812 at ¶ 18, quoting *Sokolow* at 10.

{¶ 43} We find that under the totality of the circumstances, there were not sufficient articulable facts giving rise to a suspicion of specific criminal activity to justify Trooper Doebrich's continued detention of Shaibi after verifying that the rental agreement was in Shaibi's name and dispelling Trooper Doebrich's suspicions surrounding the jewelry.[5] Other than the jewelry, Trooper Doebrich did not observe anything suspicious or concerning in

_____

5. There is no indication that the Arizona license plate on the U-Haul created the suspicion of illegal activity. In fact, Trooper Doebrich testified that U-Hauls are commonly rented with Arizona plates. Specifically, when questioned about the plates, the trooper testified as follows:

> [PROSECUTOR:] All right. Before you get out of the cruiser, do you make any other – do you run any information at all before you approach?
>
> [TROOPER DOEBRICH]: Because it's a U-Haul, it was rented out through Arizona, I typically don't run the plate. I'll just give that to our dispatcher.
>
> [PROSECUTOR]: Is that unusual for it to be out of Arizona.
>
> [TROOPER DOEBRICH]: No, it's a common plate to go on U-Hauls.

the cab of the U-Haul truck. When questioned, Sanad and Shaibi provided relatively consistent accounts of their travels and the contents of their cargo. Both men referenced a family business, with stores located in Cincinnati and Buffalo, and indicated they were transporting IKEA furniture back to Buffalo, although Shaibi added that they were also transporting "hair stuff" for the business. Trooper Doebrich had concerns about Sanad's hesitancy in answering some of the questions about the family business and seemed particularly concerned that Sanad was unable to identify the location of the Cincinnati store with more specificity other than stating it was "on Kemper." However, the trooper was informed by Sanad that the Cincinnati business had only been open for a short time (around three months) and this was Sanad's first trip to Cincinnati. Additionally, though Sanad appeared to be somewhat unsure of his social security number when he provided it to Trooper Doebrich, which the trooper found to be suspicious, the recording of the stop demonstrates the social security number was provided within seconds of being requested and Sanad provided the correct number on his first recitation.

{¶ 44} When viewed collectively, the circumstances surrounding the continued detention of Shaibi do not give rise to a reasonable, articulable suspicion of criminal activity beyond that needed to verify the rental agreement and investigate the jewelry found in the cab of the truck. At the time Trooper Doebrich continued to detain Shaibi to ask additional questions about the truck's cargo and to ask permission to view the items in the trailer of the truck, he had nothing more than generalized, unspecified suspicion, or an ill-defined hunch, that there was the "potential for criminal activity," though he could not put his finger on what that activity might be.

{¶ 45} We agree with the trial court that it is apparent from the recording of the traffic stop that Trooper Doebrich was engaged in a fishing expedition for evidence of a crime and his detainment of the U-Haul truck was "going to continue indefinitely until the Trooper

[found] evidence of a crime." Under the totality of the circumstances, there was no legal basis to continue to detain Shaibi after Trooper Doebrich confirmed the truck's rental agreement and the trooper's suspicions regarding the jewelry were dispelled.

**Consent to Search Not Valid**

{¶ 46} As the Ohio Supreme Court has explained,

> [w]hen a police officer's objective justification to continue detention of a person stopped for a traffic violation for the purpose of searching the person's vehicle is not related to the purpose of the original stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some illegal activity justifying an extension of the detention, the continued detention to conduct a search constitutes an illegal seizure.

*State v. Robinette*, 80 Ohio St.3d 234 (1997), paragraph one of the syllabus.

{¶ 47} At the time Trooper Doebrich requested consent to view the contents of the U-Haul trailer, his legal right to detain Shaibi had expired. Although Shaibi was being unlawfully detained, our analysis into the validity of the search is not complete. "Voluntary consent, determined under the totality of the circumstances may validate an otherwise illegal detention and search." *Id.* at 241, citing *Davis v. United States*, 328 U.S. 582, 593-594, 66 S.Ct. 1256 (1946).

{¶ 48} Where an "individual has been unlawfully detained by law enforcement, for his or her consent to be considered an independent act of free will, the totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave." *Id.* at paragraph three of the syllabus, citing *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319 (1983); and *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041 (1973). "'[T]he State has the burden of proving that the necessary consent was obtained and that it was *freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim*

*of lawful authority.*'" (Emphasis sic.) *Id.* at 243, quoting *Royer* at 497. "[W]hile [a] subject's knowledge of a right to refuse [consent to search] is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing consent." *State v. Smith*, 12th Dist. Warren No. CA2012-03-022, 2012-Ohio-5962, ¶ 19, citing *Robinette* at 242-243.

{¶ 49} The totality of the circumstances in this case do not indicate that a reasonable person in Shaibi's position would have believed he had the freedom to refuse to answer Trooper Doebrich's questions and was free to leave the scene. By the time Trooper Doebrich sought to obtain Shaibi's consent to search the U-Haul's trailer, Shaibi had been detained for 22 minutes, had been asked to remove himself from the cab of the U-Haul truck, and the truck's driver remained secured in the back of the trooper's cruiser. As the Sixth Circuit Court of Appeals has recognized, "[w]hen the driver is not free to leave, neither are his passengers; indeed, the passengers are at the mercy of any police officer who is withholding the return of their driver." *Richardson*, 385 F.3d at 630. Additionally, Shaibi, who told the trooper it was his first time being pulled over, had not been informed of his right to refuse consent for the search. As the Ohio Supreme Court noted in *Robinette,* "[i]f police wish to pursue a policy of searching vehicles without probable cause or reasonably articulable facts, the police should ensure that the detainee knows that he or she is free to refuse consent despite the officer's request to search or risk that any fruits of any such search might be suppressed." *Robinette,* 80 Ohio St.3d at 245, fn. 6.[6]

---

6. We in no way hold or suggest that an individual *must* be told that he or she has a right to refuse consent. Both the Ohio Supreme Court and the United States Supreme Court have clearly indicated that while a subject's knowledge of a right to refuse is *a factor* to be considered when looking at the totality of the circumstances, it is not a prerequisite to establishing voluntary consent. *State v. Robinette*, 80 Ohio St.3d 234, 242-243 (1997); *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-249, 93 S.Ct. 2041 (1973). However, as the Ohio Supreme Court recognized in *Robinette*, there are certain circumstances when informing a subject of his right to refuse consent for a search "would weigh persuasively in favor of the voluntariness of the search." *Robinette* at 245, fn. 6.

{¶ 50} Accordingly, as any reasonable person in Shaibi's position would have felt compelled to submit to the trooper's request to search the trailer, rather than consenting as a voluntary act of free will, we find that consent for the search was not freely and voluntarily given. The trial court did not error in granting Shaibi's motion to suppress and the state's sole assignment of error is overruled.

{¶ 51} Judgment affirmed.


M. POWELL, J., concurs.

PIPER, P.J., dissents.


**PIPER, P.J., dissenting.**

{¶ 52} Ohio precedent is in harmony with federal law on the issues at hand, and therefore, based upon the undeniable facts within the record, the drugs found by Trooper Doebrich should not have been suppressed by the trial court, nor affirmed by my respected colleagues.

{¶ 53} My differing opinion is for the following reasons: (1) the purpose of the original traffic stop, objectively, had not been completed; (2) after the initial stop, circumstances very quickly began accumulating, which created a totality of circumstances, and when considered together, rose to the level of a reasonable belief criminal activity could be afoot; and (3) Shaibi's consent to search was not coerced, forced, nor was his free will overcome and his consent was completely voluntary.

### Traffic Stop Needed to be Completed

{¶ 54} During a traffic stop, a law enforcement officer may take the time to separate vehicle occupants. *State v. Neal*, 10th Dist. Franklin No. 15AP-771, 2016-Ohio-1406, ¶ 28-29. An officer may also ask questions not immediately connected to the traffic infractions. *Rodriguez v. United States*, 575 U.S. 348, 355, 135 S.Ct. 1609 (2015); *Arizona v. Johnson*,

555 U.S. 323, 333, 129 S.Ct. 781 (2009). A reasonably prudent law enforcement officer's investigation will determine the vehicle is being driven by a licensed operator, run permissible record checks, verify if the occupants have outstanding warrants, make brief observations regarding the vehicle's roadworthiness and, in general, determine whether a warning or citation should be issued. *State v. Blatchford*, 12th Dist. Preble No. CA2015-12-023, 2016-Ohio-8456, ¶ 27. This, of course, is barring any extenuating circumstances that may be perceived by the officer requiring additional investigation.

{¶ 55} The trial court's determination was focused on a very limited purpose for a traffic stop, the time necessary for writing a citation. The majority adopts this perspective. However, this perspective is contrary to the tasks necessary to be completed in defining the durational scope of a traffic stop. The United States Supreme Court has held that the Fourth Amendment tolerates certain unrelated investigations provided that tasks related to a traffic infraction have not been, or reasonably should not have been, already completed. *Rodriguez*, 575 U.S. at 354-355.

{¶ 56} A traffic stop involves more than writing a citation. Other districts, as well as the Ohio Supreme Court, have noted the constitutionality of a prolonged traffic stop does not depend on the issuance of a citation. *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, ¶ 21. In considering whether tasks are completed within a reasonable time, courts must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation. *Id.* at ¶ 12. Here, as in *Batchili,* the prolonged detention was not constitutionally dubious when "permissible background checks * * * diligently undertaken [were] not yet completed" at the time of the search. *Id.* at ¶ 14. We are mindful that "reasonableness is the ultimate touchstone of any Fourth Amendment analysis." *Heien v. North Carolina*, 574 U.S. 54, 60, 135 S.Ct. 530 (2014).

{¶ 57} Trooper Doebrich observed a U-Haul rental vehicle being driven suspiciously. Specifically trained and knowledgeable in drug interdiction, Trooper Doebrich was aware that frequently, rental vehicles are stolen and used for nefarious purposes such as drug trafficking, smuggling, and the illegal hauling of people and contraband. The driver had no operator's license or photo identification; yet, he was argumentative with the trooper. This was contrasted by the passenger who was notably nervous and was unable to produce the rental agreement for the vehicle. Purportedly maintaining a business in Cincinnati, but not knowing its address, and purchasing furniture at a local Ikea store and subsequently renting a vehicle to haul it to Buffalo, New York seemed incredulous, which added to the trooper's suspicions.[7]

{¶ 58} The trooper diligently requested an EPIC record check along with confirmation of information given to him by the driver. At the time consent to search was acquired, neither the EPIC check nor the photographic confirmation had been completed. Both were pertinent to the tasks reasonably related to terminating the traffic stop. The durational scope needed for the traffic stop had simply not been fulfilled; necessary tasks associated with the traffic stop had not been completed.

{¶ 59} Unfortunately, the trial court and my colleagues substituted their judgment for that of the trooper, which the Ohio Supreme Court has warned the judiciary against. *Batchili* at ¶ 18. I would find that Trooper Doebrich was proceeding with necessary tasks related to the purposes of his initial traffic stop. This conclusion is thoroughly supported by the totality

---

7. Unlike others outside of law enforcement, a trooper assigned to drug interdiction enforcement is trained to recognize suspicious activity with an obligation to investigate such suspicions. Sanad did not know the address of the family business in which he claimed to be a participant and had allegedly just visited. He had no form of identification and Sanad was hesitant in giving his purported social security number. Additionally, he was argumentative, which seemed unusual for someone driving with no operator's license. It defies common sense that furniture would be purchased at a local store in southern Ohio and then payment made for a rental truck to haul the furniture more than 400 miles back to Buffalo, New York. Based on his training and experience, the trooper's testimony explained the significance of a "cover load."

of his testimony explaining the circumstances. Respectfully, in my opinion, the majority's opinion is adept at isolating snippets of testimony detracting from the totality of the circumstances. Even after the information the driver verbally provided was confirmed, a prudent state trooper would confirm whether the driver was, in fact, the person he or she claimed to be. The majority opinion determines a law enforcement officer must rely upon verbal information supplied for purposes of identification and that the lack of possessing any form of identification does not support a reasonable officer's desire to confirm identification. *Ante* at ¶ 32.

{¶ 60} There is no such thing as a routine traffic stop. Such a reference is only made after-the-fact when no specific or unique circumstances have arisen. Requesting an EPIC check may not be routine in every traffic stop, but its use is permissible. Such a permissible record check has been observed by Ohio courts. *State v. Gutierrez,* 9th Dist. Medina No. 2515-M, 1996 Ohio App. LEXIS 3079 (July 17, 1996); *State v. Taylor*, 12th Dist. Preble No. CA2001-02-003, 2001-Ohio-8676.

{¶ 61} There is simply no evidence within the record that Trooper Doebrich's request for an EPIC check was done for purposes of delay or to prolong the detention. As a separate matter, waiting for photographic confirmation of identity is also reasonably related to completing the traffic stop, particularly when the person has no form of photographic identification. The fact that the operator had difficulty reciting his purported social security number could easily have been an indication he was using someone else's identifying information.

{¶ 62} Here, Trooper Doebrich acted diligently, professionally, and within all reasonable expectations of the law. Only 22 minutes into these unique circumstances did

the trooper obtain consent to look inside the rented cargo truck.[8]  The request for consent was within the time necessary to complete tasks related to the original purpose of the stop. Because the stop had not yet been completed at the time the drugs were located, there is no constitutional infirmity.  "A police officer's request for consent to search a vehicle stopped for a traffic violation is valid if it is made, and voluntary consent is obtained, during the period of time reasonably necessary to process the traffic citation . . . in other words, while the driver is lawfully detained for the traffic violation."  *State v. Sexton*, 12th Dist. Butler No. CA2019-08-133, 2020-Ohio-4179, ¶ 25.  That is exactly what occurred here.[9]

{¶ 63}  I disagree with the majority's opinion that "the record does not reflect that there was any concern about the reliability of the identifying information that Sanad provided to the trooper or any concern about the information related by the intel analyst after running Sanad's information and verifying Sanad's New York license."  *Ante* at ¶ 32.  The fact that the trooper wanted to see a photograph indicated that he had a concern regarding the identity of the person operating the truck.  My colleagues deny this reasonable inference. *Ante* at ¶ 32, fn. 4

**Finding of Inconsistency Misplaced**

{¶ 64}  During the motion to suppress hearing, the trooper testified that before he

---

8.  Generally, a traffic ticket citation can be written, and the stop completed within 25 minutes.  *State v. Grenoble*, 12th Dist. Preble No. CA2010-09-011, 2011-Ohio-2343, ¶ 32.  We have determined a search initiated 28 minutes into the traffic stop was within the time duration necessary to complete tasks associated with the initial stop.  *State v. Cochran*, 12th Dist. Preble No. CA2006-10-023, 2007-Ohio-3353;  *see also State v. Bolden*, 12th Dist. Preble No. CA2003-03-007, 2004-Ohio-184 (where the time for the traffic stop had not expired when the dog alerted to the presence of dugs within 30 minutes).  No explanation exists as to why this particular stop would be considered beyond an acceptable durational period to complete the stop in light of our precedent.

9.  Other states, like Ohio, are in harmony with the application of federal law being observed in traffic stops and have seen the use of EPIC to conduct background checks, determining that they do not unduly prolong the stop.  *Commonwealth v. Benitez*, 2019 PA Super 268, 218 A.3d 460; *Martinez v. State*, 500 S.W.3d 456 (Tex.App.2016) (where the officer's EPIC check did not unduly prolong the traffic stop and the defendant voluntarily consented to the officer's search even though the defendant was not told he was free to leave).

approached Shaibi the second time, he was still waiting for information from EPIC to verify the identity of the driver. The trial court asked the trooper whether the initial information received from the trooper's contact with dispatch confirmed "that this person was who he said he was?" The trooper responded that his intel analyst confirmed the *information* given was accurate, but he was still absent a photograph of the person to whom that information belonged. The court then asked, "were you waiting on a photo?" and the trooper responded, "Yes, sir."[10]

{¶ 65} Later in the hearing, the trial court referenced the initial communication with the trooper's intel analyst, and asked, "and, did you want a photograph of the driver as well?" to which the trooper responded, "I did, but that was not something they were able to provide." Thus, the plain indication is that, per his testimony, the trooper needed to see a photograph for identification purposes and could not obtain it through normal, local channels, and therefore attempted such verification through exterritorial networks. The reasonable inference from the trooper's testimony is that requesting an EPIC check was (1) to see what information on the driver was available, and (2) to receive a photograph for identification purposes if available.

{¶ 66} The video of the stop indicates that the trooper communicated with an intel analyst at various times. At one point, the trooper asked the analyst for help in identifying Sanad. During that communication, the analyst asked the trooper if he wanted the photograph of Sanad. As noted by the majority, the trooper responded, "No. I just need to see if you can just pull it up. I've got the soc[ial], name, and DOB." The majority interprets this to mean that the trooper did not want to *see* a photograph. However, a reasonable

---

10. In support of their conclusions, my colleagues interpret the trooper's testimony to mean the trooper never doubted Sanad's identity. *Ante* at ¶ 32. Yet, the reasonable inference of wanting to confirm the driver's identity is abundantly clear. Certainly, a trooper is not obligated to accept verbal representation as to who someone is, and can seek permissible record checks, particularly when circumstances seem questionable.

interpretation of this dialog is that the trooper needed to *view* the photograph over the computer and did not need the analyst to send it, or forward it, to the trooper but rather just needed the photograph to be pulled up in order to view it.

{¶ 67} The record repeatedly indicates the trooper's need to see a photograph of the driver. *Ante* at fn. 4. The fact that the trooper can be heard on video stating that he did not want to possess the photograph, or have it sent, does not contradict his testimony that he needed to view a photograph, nor does it call into question the credibility of the trooper's testimony. In fact, the trial court finds the trooper to be credible on several occasions and never insinuates the trooper was inconsistent, as the majority finds.

{¶ 68} Both parties chose to play portions of the stop for the trial court and questioned the trooper on what occurred at various points during the stop. However, neither party referenced the exchange between the analyst and the trooper regarding the photograph, nor did defense counsel cross-examine the trooper in an effort to impeach his repeated testimony that he wanted to view a photograph of Sanad. My colleagues are misguided in constructing an interpretation of this very limited exchange as inconsistent; it was unexplained, undeveloped, and not relied upon by either party or the trial court. It was never argued in the trial court or on appeal that this dialog revealed the trooper as being inconsistent. No one other than my colleagues attributed any weight or significance to this exchange, particularly in light of the trooper's testimony on several occasions that he wanted to see a photograph in order to verify the identity of the driver. The interpretation of "inconsistent" is inappropriately relied upon by the majority.

{¶ 69} While the trooper may have had a name and corresponding information with which to fill out blank lines on a citation, the trooper specifically testified that he was waiting for additional information before completing the traffic stop. As such, and based on his training and experience, the trooper was not yet prepared to simply fill out a citation form

and end the traffic stop. Furthermore, prior to completing the traffic stop detention, the trooper indicated he suspected criminal activity.[11]

**The Trooper's Articulable Suspicion**

{¶ 70} While the concept of reasonable and articulable suspicion has not been precisely defined, it has been described as something more than an undeveloped suspicion or hunch, but less than probable cause. *State v. Moore*, 12th Dist. Fayette No. CA2010-12-037, 2011-Ohio-4908, ¶ 31-33. Reasonable suspicion entails some minimal level of objective justification. *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581 (1989); *See also State v. Byrd*, 12th Dist. Butler No. CA98-05-107, 1999 Ohio App. LEXIS 154, * 7 (Jan. 25, 1999) (where consent to search was obtained during a prolonged detention and there was "objective justification" for extending the investigation). An objective justification to suspect criminal activity has been more recently referred to as an "objective basis." *Kansas v. Glover*, ___U.S.___, 140 S.Ct. 1183 (2020) (in evaluating the objective basis, the standard is less than a preponderance).

{¶ 71} An officer's experience in narcotics investigations, combined with conduct by a defendant consistent with drug activity can support a belief of reasonable suspicion. *State v. Bobo*, 37 Ohio St.3d 177, 179-180 (1988); *State v. Hinkston*, 12th Dist. Clermont No. CA2020-03-012, 2020-Ohio-6903, ¶ 20. A determination of reasonable, articulable suspicion must be based on the collection of factors, not on the individual factors themselves. *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, ¶ 19; *State v. Ratliff*, 12th Dist. Butler No. CA2019-09-163, 2020-Ohio-3315, ¶ 6-7. Fourth Amendment jurisprudence is clear; whether reasonable articulable suspicion exists is not measured by

---

11. When asked, "was there anything that you were trying to clear up before writing this citation?" the trooper responded, "yes, sir there was." The trooper went on to testify, "without the lack of a rental agreement, also the observations, travel and statements from both driver and passenger and behavior, I believe there is criminal activity."

a "strict, inflexible standard," rather, "its determination involves a consideration of the totality of the circumstances." *State v. Sexton*, 12th Dist. Butler No. CA2019-08-133, 2020-Ohio-4179, ¶ 29.

{¶ 72} The totality of circumstances must be considered and "viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Andrews*, 57 Ohio St.3d 86, 87-88 (1991). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744 (2002). The trooper's reasonable inferences are not invalidated simply because my colleagues may draw different inferences from those of the specially trained trooper.

{¶ 73} Moreover, a determination that reasonable suspicion exists need not rule out the possibility of innocent conduct. *State v. Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, ¶ 19-22. In permitting detentions based on reasonable suspicion, it is an acceptable risk that officers may briefly detain innocent people. *Illinois v. Wardlow*, 528 U.S. 119, 126, 120 S.Ct. 673 (2000). When determining whether reasonable suspicion exists, the relevant inquiry is not whether particular conduct is innocent or guilty, but whether suspicion reasonably attaches to particular types of *noncriminal* acts. *State v. Karsikas*, 11th Dist. Ashtabula No. 2020-A-0017, 2020-Ohio-5058, ¶ 23.

{¶ 74} "Behavior and circumstances that are noncriminal by nature may 'be unremarkable in one instance * * * while quite unusual in another.'" *Hawkins*, 158 Ohio St.3d 94 at ¶ 23, quoting *Arvizu*, 534 U.S. at 274. Therefore, "[a]n officer is 'entitled to make an assessment of the situation in light of his specialized training * * *." *Id.* Respectfully, I do not find, as does the majority, that a trooper applying his specialized training to the totality of the circumstances is engaged in "a fishing expedition." *Ante* at ¶ 21. There is no

evidence in the record that Trooper Doebrich was simply passing time "fishing;" rather, he was using his training and experience and applying them to the facts before him.

{¶ 75} The record demonstrates that the trooper, who had over seven years of experience, also had training in drug interdiction. This included direct involvement with the ATF, DEA, FBI, Warren County Drug Task Force, Hamilton County Drug Task Force, as well as the Cincinnati Police's special investigative units on gangs and violent crimes. The trooper was also a canine handler for over two years.

{¶ 76} The trooper testified to his extensive training and experience, and there is no indication in the record that the trial court had any difficulty with the trooper's credibility. The trooper testified that his articulable suspicion began to arise after observing the U-Haul truck slow down when it passed his location, and then speed up. The driver then committed multiple traffic violations that created a pattern of "nervous driving" to which the trooper testified. The trooper explained that his connection with criminal interdiction involves his observations on "nervous driving behavior, vehicle slowing down, rapid lane changes, different elements that show a nervous behavior based on our presence associated with the fear."

{¶ 77} The trooper's suspicions were then extended after his approach to the U-Haul and his observations of the occupants. The trooper testified that Sanad was "argumentative" with him, which behavior Trooper Doebrich found to be "uncommon." The trooper further testified that the passenger, Shaibi, "appeared nervous. His hands shook * * *," he also lacked eye contact, which was "quite unusual to see * * *."

{¶ 78} During the time that the trooper made initial contact with Sanad and Shaibi, he observed a "large bag of jewelry" which was "odd, why they had that with them." Compounding existing questions surrounding the jewelry, Sanad was not able to produce any form of identification, stating he had left his wallet in Cincinnati.

{¶ 79} The trooper's articulable suspicions mounted further when he spoke to Sanad and Shaibi about their journey and the circumstances of the family business. The trooper testified that Sanad "had no real certain reason why they would have business in Cincinnati, which was odd to me." Sanad was also unable to give the trooper an address for the business, and "seemed very unsure of the location." Sanad was hesitant or reluctant when asked about the owner of the family business. Moreover, despite being a purported participant in the family business, Sanad told the trooper that he had never visited Cincinnati prior to this trip.

{¶ 80} The trooper also testified that his articulable suspicions continued to escalate when Shaibi was unable to produce the rental agreement. When asked about his continued observations of Shaibi, the trooper testified that Shaibi exhibited nervous behavior, which was heightened and unusual. "It's common people are nervous on our first approach, but typically when people know, you know they're going to be issued a citation or not, they tend to calm down and being the passenger, there's no violation being committed." Specifically, the trooper testified that upon his reapproach, Shaibi maintained his nervousness, "lack of eye contact, hand shaking, didn't appear calm while sitting in that vehicle." Even after Shaibi was able to provide an electronic copy of the rental agreement, his "hand [was] shaking and rapid breathing, all things consistent with an adrenaline rush based on fear."

{¶ 81} As clearly established by federal and Ohio law, we must view the reasonableness of the trooper's articulable suspicion on the collection of factors, not on the individual factors analyzed in isolation. As such, the fact that the U-Haul was traveling on an interstate known as a major drug corridor is not enough to support articulable suspicion on its own. Nor is the single fact that the driver was argumentative upon approach. However, once the facts start to build upon one other, the specifically trained and

experienced trooper developed a suspicion that was reasonable.[12]

{¶ 82} From the very beginning, Trooper Doebrich began forming reasonable suspicion. The vehicle was observed being operated in a suspicious manner. When stopped, the driver had no operator's license and no form of identification. His response to the trooper was to be argumentative. He appeared slow or reluctant to give what he purported to be his social security number. A bag of loose jewelry was observed on the front seat between the two men. Even after a period of time had passed, the passenger could not calm down to the extent of displaying substantial physical symptoms. The driver, who claimed to be a business participant, could not give the address to the business and had never been to Cincinnati before this trip. The men purportedly purchased furniture at a local Ikea, paid to rent a truck, and were hauling the furniture over 400 miles back to Buffalo, New York. It is evident from the trooper's testimony that he suspected the cargo truck may contain a "cover load." To a law enforcement officer, trained and experienced in drug interdiction, all of this, when considered together, created reasonable suspicion.[13]

{¶ 83} Trooper Doebrich had a reasonable objective basis for believing criminal activity was afoot. Even if the trooper's traffic stop exceeded the durational scope for a traffic stop, articulated facts gave rise to a reasonable suspicion of criminal activity justifying further detainment for purposes of investigation. *Byrd*, 1999 Ohio App. LEXIS 154 at *8. However, I find this reasonable suspicion was sufficiently formed prior to the time the initial

---

12. I am not suggesting the judiciary is obligated to blindly follow or accept any nonsensical or irrational explanation or justification. However, when the explanations or justifications are reasonable, deference should be given to those with specialized training and experience in the war against drugs. Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (4th ed. 2004), § 9.3(c), Vol. 4, p. 516.

13. While Trooper Doebrich testified that Arizona license plates on a rented UHaul are common, he did not testify that such did not add to his reasonable articulable suspicion as the majority implies. *Ante* at fn. 5. While an Arizona license plate is itself meaningless, viewed through the eyes of a specially trained and experienced drug interdiction officer, the meaning may be different. *They Didn't Look Right to Me! Reasonable Suspicion in Kansas: Through Whose Eyes is it Viewed?* Colin D. Wood, JKSBA 76-SEP J.KAN.BA 16: pg 21.

traffic investigation was required to terminate.

**Voluntary Consent to Search**

{¶ 84} Even if the stop had been invalid at its inception, or lost its constitutional footing at some point, Shaibi gave voluntary consent to the trooper to search the contents of the U-Haul rendering the search constitutionally valid. There is no doubt that "voluntary consent, determined under the totality of the circumstances, may validate an otherwise illegal detention and search." *State v. Robinette*, 80 Ohio St.3d 234, 241 (1997); *Heien*, 574 U.S. 54.

{¶ 85} The Ohio Supreme Court had a prior decision stating that "any attempt at consensual interrogation must be preceded by the phrase 'at this time you legally are free to go' or by words of similar import." *State v. Robinette*, 73 Ohio St.3d 650, 655 (1995) ("*Robinette I*"). However, the United States Supreme Court reversed the *Robinette I* decision, finding that one may give consent without directly being told that he or she is free to go. *Ohio v. Robinette*, 519 U.S. 33, 40, 117 S.Ct. 417 (1996) ("*Robinette II*"). Instead, the *Robinette II* court specifically held, "the Fourth Amendment test for a valid consent to search is that the consent be voluntary, and voluntariness is a question of fact to be determined from all the circumstances." *Id*.

{¶ 86} The case was then remanded to the Ohio Supreme Court for additional consideration. *Robinette*, 80 Ohio St.3d at 241 ("*Robinette III*"). On remand, the *Robinette III* court was asked to determine if the Ohio Constitution provided greater protections than the Fourth Amendment to the United States Constitution regarding search and seizure. Specifically, the court was asked if independent state grounds existed to require Ohio officers to inform a person that he or she is free to go before obtaining voluntary consent to search. The *Robinette III* court determined that Ohio law provides no greater protections than the Fourth Amendment, and when the state justifies a search based on consent, such

consent must be "in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances * * *." *Id.* at 243-244.

{¶ 87} The majority quotes a footnote in *Robinette III* which indicates that the better practice for police might be to make an individual aware he or she is free to refuse a consensual search. It is necessary to view the footnote in context. First, the *Robinette III* court made its footnote suggestion under the premise that some searches will be conducted "without probable cause or reasonably articulable facts." Yet, in Shaibi's case, there were reasonable articulable facts supporting the constitutionality of the trooper's investigation. However, the fact remains that the *Robinette III* court specifically stated in its footnote that it refused to mandate "any bright-line test or magic words" and the court's holding was that voluntariness of consent is determined by a totality of the circumstances.

{¶ 88} *Robinette III* specifically holds the police do not have to tell an individual that he or she has the right to refuse consent. The majority therefore places emphasis on the footnote to justify their determination that Shaibi's consent was involuntary. Respectfully, I find this to be a misstep. As noted in the body of *Robinette III*, every search situation is unique unto itself and no set of fixed rules will be sufficient to cover every situation. *Id.* at 242.

{¶ 89} The trooper testified that he asked Shaibi, as the renter of the U-Haul, for permission to search the back compartment of the truck. Shaibi produced a key for the padlock that was attached to the truck and Shaibi "offered to open it up and I asked for consent and he granted consent and opened the rear of the U-Haul." The trooper testified that Shaibi was "very compliant and very willing to allow me to complete" the investigation. Moreover, the trooper testified that when he asked Shaibi if he could look at the contents of a bag that was located in the back of the truck, Shaibi again "granted consent and motioned

also with his hand, he stepped back and allowed me to complete a consent search of the vehicle."

{¶ 90} Shaibi was only a passenger and not the driver subject to a citation. Shaibi was never given any authoritative commands or restrained in any way. The video demonstrates that the exchange between the trooper and Shaibi had a conversational tone. The trooper made it appear that he accepted Shaibi's explanations and never acted displeased, disrespectful, or authoritative with Shaibi. The video shows the trooper and Shaibi being affable to one another, and the trooper asking, and receiving, permission on several occasions.

{¶ 91} There is simply zero evidence of even the remotest form of coercion or pressure in order to receive consent. Defense counsel's cross-examination of the trooper even seemed to emphasize how Shaibi was cooperative and assisted the trooper. There is nothing in the record to contradict the trooper's testimony that Shaibi gave consent freely and voluntarily. There was no finding by the trial court that the trooper was not credible, nor was there any finding by the trial court that the consent given was not voluntary. The majority's finding that the state failed to present sufficient evidence that the consent was voluntarily given is incorrect.

{¶ 92} The United States Supreme Court has noted that, "while most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758 (1984). Consent to search can be voluntary without being an intentional relinquishment of a known right or privilege. The state is not required to demonstrate Shaibi's knowledge or awareness regarding his right to refuse consent as a prerequisite to establishing a voluntary consent. *See Schneckloth* at 249. Under circumstances within the record, there is no reason to

believe the response to the trooper's request to search was presumptively coerced. *State v. Valiente-Mendoza*, 6th Dist. Wood No. WD-16-067, 2018-Ohio-3090 (where the denial of the motion to suppress was affirmed because the verbal consent was not the product of duress or coercion when the trooper requested to search the vehicle compartment and requested a second time for permission to search the engine compartment).

{¶ 93} After considering the totality of the circumstances surrounding Shaibi's consent to search the U-Haul, and with the record given, I would find that Shaibi gave voluntary consent. There is no indication in the record that Shaibi was of limited intelligence, or lacked the facilities necessary to understand the nature of his encounter with the trooper. Nor is there any indication in the record that Shaibi submitted to the search under duress or coercive police procedure, express or implied. The trial court's written decision suggests the trial court determined by operation of law if the consent given was beyond the time it takes to write a ticket, it is automatically an invalid consent even if given voluntarily. However, this is not the law. *Robinette III*; *Heien*, 574 U.S. 54. Shaibi fully cooperated, hopeful that if the trooper located the foreign plant material, Shaibi could convince the trooper it was tea.[14]

**Conclusion**

{¶ 94} I find that the record fully supports a denial of Shaibi's motion to suppress on multiple constitutional grounds, including that the trooper's search had a reasonable basis and was supported by reasonable articulable suspicion during a timeframe wherein the

---

14. {¶a} When Shaibi was asked by the trooper what the substance was, Shaibi attempted to assert it was tea. However, the trooper's specialized training in drug interdiction gave him familiarity with the illegal substance, Khat.

{¶b} As an additional sidenote, Shaibi indicates in his motion to suppress he also signed a written consent, but I give no consideration whatsoever to the possibility of a written consent existing because it was not entered into the record and is not necessary in order to conclude from the totality of the circumstances that Shaibi's consent was voluntarily given.

purpose of the traffic stop was still being investigated. I would also find that Shaibi gave voluntary consent to have the U-Haul and plastic bag found within searched. From start to finish, the trooper's investigation did not violate any of Shaibi's constitutional rights. Thus, I would reverse the decision of the trial court and remand the cause for further proceedings. Therefore, I respectfully dissent.