[Cite as *State v. Gray*, 2023-Ohio-338.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2022-02-006 |
| | : | O P I N I O N |
| - vs - | | 2/6/2023 |
| | : | |
| LARRY WAYNE GRAY, JR., | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 21CR38196

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

The Helbling Law Firm, LLC, and John J. Helbling, for appellant.

**HENDRICKSON, J.**

{¶1}     Appellant, Larry Wayne Gray, appeals from his judgment of conviction in the Warren County Court of Common Pleas for trafficking marijuana, possessing marijuana, and engaging in a pattern of criminal activity.  For the reasons below, we affirm the decision of the trial court.

{¶2}     In the fall of 2020, the Warren County Drug Task Force ("WCDTF") began

reviewing phone calls between an inmate, Joseph Lawter, and his girlfriend, Deeion Sandlin. The two spoke about a drug supplier from California named Burgess Faris. Due to the nature of these phone calls, the WCDTF began surveilling Sandlin.

{¶3} On October 23, 2020, the WCDTF observed Sandlin drive to a storage facility in Beavercreek where she spoke with another individual, later identified to be Faris. Once Sandlin and Faris were in the storage facility, the officers observed Faris load an object into Sandlin's vehicle. Sandlin and Faris left the storage facility in separate vehicles and were immediately stopped by the officers.[1] After a canine alerted to drugs in Sandlin's vehicle, officers searched her vehicle. Faris consented to a search of his vehicle.

{¶4} The search of Sandlin's vehicle yielded five pounds of marijuana in vacuum-sealed, one-pound bags, stored in the tire compartment of her trunk, along with a black storage tote with a yellow lid. The search of Faris' vehicle yielded roughly $14,700 in cash. Thereafter, Sandlin consented to a search of her apartment, which contained two more identical black totes with yellow lids. Faris consented to a search of the Beavercreek storage unit, which contained another black tote with a yellow lid.

{¶5} During a subsequent interview, Faris informed the WCDTF that Gray was involved in this drug-related activity. Faris told the officers that Gray had a warehouse in Indiana containing 100 pounds of marijuana. Faris worked with the WCDTF to set up a controlled buy for the 100 pounds of marijuana to take place the next day in the parking lot of a Hooters restaurant in Mason, Ohio. Faris gave details to Detective Schweitzer of the WCDTF regarding Gray's appearance, as well as the make, model, and license plate number of Gray's vehicle. With this information, the WCDTF independently obtained Gray's full identity, including his social security number and a photograph.

---

1. The officers stopped Sandlin and Faris based on their reasonable suspicion that Faris and Sandlin were engaged in criminal activity.

{¶6} During the morning of October 24, 2020, prior to the controlled buy, Faris provided real-time updates to Detective Schweitzer about the transaction, informing him that because Gray had sold 50 pounds of the marijuana, the controlled buy would only involve the other 50 pounds, and would take place around 1:00 p.m. Around that time, Gray pulled into the Hooters parking lot driving the anticipated vehicle. The officers were able to positively identify Gray based on the vehicle description and the photograph. Gray parked the car, exited the vehicle, and walked around to the back of the car and opened the trunk. The officers immediately converged on Gray, who was handcuffed and detained in a marked cruiser.

{¶7} Trooper Lee read Gray his *Miranda* rights and then had his canine partner, Ronnie, perform a free-air sniff around the exterior of the vehicle. The canine positively alerted to drugs inside the vehicle, which was thereafter searched. The search of Gray's vehicle yielded roughly 50 pounds of marijuana and $15,000 in cash. The marijuana was individually packaged in one-pound, vacuum-sealed bags. There were also two black totes with yellow lids found inside the vehicle. The black totes were identical to the ones found in Sandlin's vehicle and Faris' storage unit.

{¶8} Gray was transported a short distance to the Deerfield Township post of the Warren County Sheriff's office where he was interviewed by Detective Schweitzer. Prior to conducting the interview, Detective Schweitzer asked Gray if he wanted to be informed of his *Miranda* rights again. Gray declined and indicated that he understood his rights by saying, "Yeah, I know my rights." Gray did not ask for a lawyer and did not exercise his right to remain silent. During this interview, Gray told the Detective that Faris was a drug dealer with a large marijuana farm in California. Gray stated that he first became involved with Faris by purchasing small amounts of marijuana, but then began assisting Faris with transporting larger amounts.

{¶9}  Gray was charged with trafficking in marijuana, a first-degree felony (Count I); possession of marijuana, a second-degree felony (Count II); possession of criminal tools, a fifth-degree felony (Count III); and engaging in a pattern of corrupt activity, a first-degree felony (Count IV).  Gray was found guilty on all but Count III.

{¶10}  As reflected in its sentencing entry, the trial court merged Counts I and II, and sentenced Gray as follows.  On Count I, the court imposed an indefinite sentence of 5 years minimum to 7 ½ years maximum.  On Count IV, the court imposed an indefinite sentence of 3 years minimum to 4 ½ years maximum to run consecutively to Count I, resulting in a total minimum sentence of 8 years to 9 ½ years maximum.

{¶11}  Gray now appeals his convictions, raising three assignments of error for our review.

{¶12}  Assignment of Error No. 1:

{¶13}  THE TRIAL COURT ERRED TO THE DEFENDANT-APPELLANT'S PREJUDICE WHEN IT DENIED THE DEFENDANT-APPELLANT'S MOTION TO SUPPRESS.

{¶14}  In his first assignment of error, Gray asserts that the trial court erred when it denied his motion to suppress evidence obtained from the search of his vehicle.  Specifically, he argues that the automobile exception does not justify the warrantless search of his vehicle's trunk.  He further argues that because police had time to obtain a warrant, a warrantless search of the vehicle was unreasonable.  Additionally, Gray argues that the motion to suppress was improperly denied because his initial *Miranda* warnings were no longer effective when he was interviewed by the police.

**A. STANDARD OF REVIEW**

{¶15}  In reviewing a motion to suppress, we are presented with a mixed question of law and fact.  *State v. Thomas*, 12th Dist. Warren No. CA2012-10-096, 2013-Ohio-3411, ¶

18. The trial court, sitting as the trier of fact, is in the best position to evaluate witness credibility and resolve factual questions. *State v. Cochran*, 12th Dist. Preble No. CA2006-10-023, 2007-Ohio-3353, ¶ 12. Provided the trial court's findings are supported by competent, credible evidence, a reviewing court accepts the trial court's findings of fact. *Id.* However, an appellate court independently reviews the trial court's legal conclusions based on those facts to determine, without deference to the trial court's decision, whether the facts satisfy the appropriate legal standard. *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298, ¶ 12.

{¶16} Gray's merit brief focuses only on the officer's failure to obtain a warrant for the search of the vehicle as well as the scope of that search, but Gray makes no argument challenging the initial stop of his vehicle. It is not until his reply brief that Gray argues that the police officer's initial stop of his vehicle was unlawful, asserting that the automobile exception is prefaced with either "some type of traffic violation" or "exigent circumstances." As we have previously recognized, "[a]n appellant may not use a reply brief to raise new issues or assignments of error." *State v. Renfro*, 12th Dist. Butler No. CA2011-07-142, 2012-Ohio-2848, ¶ 28. Thus, our analysis is limited only to whether the officers had probable cause to search Gray's vehicle.

{¶17} With this in mind, we note, however, that the record shows that Gray's vehicle was already stopped when the officers approached. Thus, the Fourth Amendment was not implicated simply by the officers approaching Gray in the parking lot. Several Ohio courts hold that when a vehicle is already stopped, an officer can approach the vehicle for the purposes of conducting a routine investigation. *State v. Murphy*, 5th Dist. Fairfield No. 2005-CA-46, 2005-Ohio-6336, ¶ 10; *State v. Cookson*, 4th Dist. Washington No. 00CA53, 2001 Ohio App. LEXIS 4384, *9 (Sep. 25, 2001) ("[I]f a vehicle is already stopped or parked, a police approach and encounter with the stationary vehicle and its driver does not implicate

the Fourth Amendment."); *State v. Cominsky*, 11th Dist. Lake No. 2001-L-023, 2001 Ohio App. LEXIS 5658, *5-6 (Dec. 14, 2001) (holding that because appellant's vehicle was already stopped, the Fourth Amendment was not implicated when the officer approached him). As such, the Fourth Amendment was not implicated when the officers initially approached Gray's already stopped and parked vehicle.

## B. THE AUTOMOBILE EXCEPTION

**{¶18}** Gray asserts that while Ohio recognizes the automobile exception, the exception is limited in certain situations to the search of only the passenger compartment and not the trunk of the vehicle. Gray argues that the case sub judice is one of these situations.

**{¶19}** Under the Fourth Amendment, searches and seizures conducted without prior approval by a judge or a magistrate are per se unreasonable, "subject to only a few specifically established and well-delineated exceptions." *State v. Shaibi*, 12th Dist. Warren No. CA2020-07-038, 2021-Ohio-1352, ¶ 25, quoting *State v. Kessler*, 53 Ohio St.2d 204, 207 (1978). One of the well-established exceptions to the search warrant requirement is the automobile exception, which allows the warrantless search of an automobile by police officers who have probable cause to believe that the vehicle contains contraband. *Carroll v. United States*, 267 U.S. 132, 158-159, 45 S.Ct. 280 (1925); *State v. Vega*, 154 Ohio St.3d 569, 572 (2018).

**{¶20}** With respect to automobiles, probable cause is "a belief reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction." *State v. Lynn*, 12th Dist. Butler Nos. CA2017-08-129 and CA2017-08-132, 2018-Ohio-3335, ¶ 16. The determination of probable cause is "fact-dependent and turns on what the officers knew at the time they conducted the search." *State v. Raphael*, 12th Dist. Warren Nos. CA2014-

11-138 and CA2014-11-139, 2015-Ohio-3179, ¶ 23. Thus, law enforcement officers may search a vehicle without a warrant if the officers have probable cause to believe that the vehicle contains contraband.

{¶21} The United States Supreme Court, as well as Ohio courts, have determined that "the exterior 'sniff' by a trained narcotics dog to detect the odor of drugs is not a search within the meaning of the Fourth Amendment to the United States Constitution." *State v. Rusnak*, 120 Ohio App. 3d 24, 28 (6th Dist. 1997); *see also United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637 (1983). Therefore, the police need not have even a reasonable suspicion of drug-related activity prior to subjecting the exterior of an otherwise lawfully stopped vehicle to a canine sniff. *State v. Cochran*, 12th Dist. Preble No. CA2006-10-023, 2007-Ohio-3353, ¶ 25. However, if a trained narcotics dog alerts to the odor of drugs from that lawfully stopped vehicle, "an officer has probable cause to search the vehicle for contraband." *Id.* Thus, a vehicle lawfully stopped may be subjected to a canine sniff even without the presence of a reasonable suspicion of drug-related activity; if the dog positively alerts, then the officers have probable cause to search the vehicle. *Id.*; *State v. Morales*, 5th Dist. Licking No. 2004 CA 68, 2005-Ohio-4714, ¶ 68.

{¶22} In terms of the permissible scope of a search pursuant to the automobile exception, the Ohio Supreme Court has held that "[w]here police officers have probable cause to search an entire vehicle, they may conduct a warrantless search of every part of the vehicle and its contents, including all movable containers and packages, *that may logically conceal the object of the search*." (Emphasis added.) *State v. Welch*, 18 Ohio St.3d 88, 92 (1985); *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157 (1982), paragraph (c) of the syllabus. The Ohio Supreme Court, however, has limited the scope of a search when the officer's probable cause is based solely on the odor of burnt marijuana, holding that "[a] trunk and a passenger compartment of an automobile are subject to different

standards of probable cause to conduct searches." *State v. Farris*, 109 Ohio St.3d 519, 529 (2006); *State v. Lynn*, 12th Dist. Butler Nos. CA2017-08-129 and CA2017-08-132, 2018-Ohio-3335, ¶ 18 ("This proposition is established by the common sense observation that an odor of burning marijuana would not create an inference that burning marijuana was located in a trunk"); *State v. Curry*, 1st Dist. Hamilton No. C-210274, 2022-Ohio-627, ¶ 21 ("To search a trunk, an officer must observe more than just an odor of burnt marijuana in the passenger compartment").

{¶23} Nevertheless, Ohio courts have drawn a distinction between an officer smelling burnt marijuana and a trained narcotics dog alerting to the presence of narcotics. In the latter scenario, a positive alert by a trained drug sniffing dog is sufficient to establish probable cause to search the trunk. *State v. Ross*, 9th Dist. Medina No. 15CA0021-M, 2016-Ohio-7082, ¶ 15-16 (noting that the Ohio Supreme Court, in reaching its ultimate decision in *Farris*, relied on the Tenth Circuit's decision in *United States v. Nielsen*, 9 F.3d 1487, 1491 [10th Cir. 1993], where the Tenth Circuit stated that "[i]f this were a case of an alert by a trained drug sniffing dog with a good record, we would not require corroboration to establish probable cause" [to search the trunk]); *see also State v. Waldroup*, 100 Ohio App. 3d 508, 514 (12th Dist. 1995) ("When the dog indicated that drugs were present in the trunk of appellant's vehicle, the troopers had probable cause to search the trunk and the container they found in the trunk").

{¶24} Trooper Brett Lee of the WCDTF testified that after Gray had been detained, he and his canine partner, Ronnie, approached Gray's vehicle to perform a free-air sniff of the outside of the vehicle.[2] Prior to performing the free-air sniff, the car doors and trunk

---

2. The trial court heard testimony regarding Ronnie's level of training and no objections were raised at that time, nor does Gray raise any objections to Ronnie's qualifications or skills in his brief.

were closed.[3]  Ronnie alerted to the driver's side of the vehicle by "bracketing, deep breathing and he indicated near the driver's side rear well and the rear driver's side door seam, by sitting down and staring into the vehicle."  Trooper Lee stated that Ronnie's behavior gave a "positive indication on a narcotic inside the vehicle."  This positive alert from Ronnie gave the officers probable cause to search Gray's vehicle.

**{¶25}**  This is not a case where an officer smelled burnt marijuana and then searched the entirety of the vehicle.  Rather, the canine, and not the officer, detected the scent of illegal narcotics.  As explained above, if a trained narcotics dog "alerts to the odor of drugs from a lawfully detained vehicle, an officer has probable cause to search the vehicle for contraband."  *State v. Wilson*, 12th Dist. Butler No. CA2019-08-141, 2020-Ohio-3227, ¶ 19.  In this case, the contraband was 50 pounds of marijuana.  Thus, the officers had probable cause to search any part of the vehicle that may logically contain this large amount of marijuana, including the trunk of the vehicle.  As such, we find no error in the trial court's denial of Gray's motion to suppress based on the scope of the search.

## C. TIME TO OBTAIN A WARRANT

**{¶26}**  Gray also argues that the trial court erred in denying his motion to suppress because the officers had enough time to obtain a search warrant prior to conducting a search of his vehicle.

**{¶27}**  Implicit in this argument is that the automobile exception requires a separate exigent circumstance to conduct a warrantless search.  However, the United States Supreme Court has recognized that the automobile exception has no separate exigency requirement.  *Maryland v. Dyson*, 527 U.S. 465, 466, 119 S.Ct. 2013 (1999) ("[U]nder our established precedent, the 'automobile exception' has no separate exigency requirement").

---

3. Gray opened the trunk himself after exiting the vehicle, and other officers opened the doors of the vehicle to ensure there were no other individuals inside the vehicle.

This is because the "mobility of automobiles creates the exigent circumstance and is the traditional justification for this exception to the Fourth Amendment's warrant requirement." *State v. Fritz*, 12th Dist. Clermont Nos. CA2019-12-094 and CA2019-12-095, 2020-Ohio-5231, ¶ 32. "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle *without more*." (Emphasis added.)  *State v. Ivery*, 11th Dist. Lake No. 2011-L-081, 2012-Ohio-1270, ¶ 23; *Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S.Ct. 2485 (1996).  It is of no consequence that Gray was outside of the car near the trunk when police approached and thereafter detained him during the search of the vehicle.  A vehicle's "inherent mobility—not the probability that it might actually be set in motion—is the foundation of the mobility rationale." *State v. Battle*, 10th Dist. Franklin No. 10AP-1132, 2011-Ohio-666, ¶ 30.

{¶28}  Gray further argues that because the officers obtained information regarding Gray's identity by 9:00 a.m. on the day of the controlled buy, but the buy did not occur until 1:00 p.m. that day, this four-hour window gave the officers plenty of time to obtain a warrant. However, as explained above, under the automobile exception, all that is required of law enforcement to conduct a warrantless search of a readily mobile vehicle is probable cause.

{¶29}  Here, the officers had probable cause to search Gray's vehicle based not only on the canine's alert, but "on the events leading up to [the] stop or search." *Bowling Green v. Godwin*, 110 Ohio St.3d 58, 62, 2006-Ohio-3563.  Faris provided information to Detective Schweitzer regarding Gray's physical appearance as well as the license plate number and make, model, and color of Gray's car.  Through this information, the officers were able to independently verify Gray's identity, including his birth date, social security number, and a photograph.  Faris informed police officers that Gray had 100 pounds of marijuana stored in a warehouse in Indiana, and he set up a controlled buy with the police for the purchase of that marijuana.  Faris also provided details and real-time updates of the drug transaction

to law enforcement officers, informing them that the transaction would involve 50 pounds of marijuana, as Gray had sold the other half. The events leading up to the search unfolded in the precise way Faris described—Gray arrived in the vehicle Faris described, with the license plate Faris provided, at the location and time that Faris provided.

**{¶30}** We agree with the trial court that these facts, taken together, in addition to the free-air sniff, gave the officers probable cause to search Gray's vehicle, including the trunk. The officers were informed by Faris that Gray was going to arrive with 50 pounds of marijuana, and it was logical for the officers to infer that the trunk of the vehicle could contain this large amount. Thus, Gray's argument that the officers had time to obtain a warrant, and violated Gray's Fourth Amendment rights by not doing so, is without merit.

### D. *MIRANDA* WARNINGS

**{¶31}** Gray also asserts that the trial court erred in denying his motion to suppress because his initial *Miranda* warnings were rendered stale between the time he was initially advised of his rights upon detention and when he was interviewed at the police station.

**{¶32}** A defendant who is subject to a custodial interrogation "must be advised of his *Miranda* rights and make a knowing and intelligent waiver of those rights before statements obtained during the interrogation will be admissible." *State v. Treesh*, 90 Ohio St.3d 460, 470 (2001). However, it is "well-established that a suspect who receives adequate *Miranda* warnings prior to a custodial interrogation need not be warned again before each subsequent interrogation." *State v. Rader*, 12th Dist. Butler No. CA2010-11-310, 2011-Ohio-5084, ¶ 8. That is, police are not required to re-administer *Miranda* warnings when only a relatively short period of time has elapsed since the initial warnings. *Id.*

**{¶33}** In determining whether initial *Miranda* warnings remain effective in a subsequent interrogation, the Ohio Supreme Court has found that the following factors are

relevant: (1) the length of time between the initial warnings and the subsequent interrogation; (2) whether the initial warnings and the subsequent interrogation were given in the same or different locations; (3) whether the warnings and subsequent interrogation were conducted by the same or different officers; (4) the extent to which the subsequent statement in the interrogation differed from any previous statements; and (5) the apparent intellectual and emotional state of the suspect. *State v. Roberts*, 32 Ohio St.3d 225, 232 (1987); *State v. Renfro*, 12th Dist. Butler No. CA2011-07-142, 2012-Ohio-2848, ¶ 19.

**{¶34}** Here, both Trooper Lee and Detective Schweitzer testified that Trooper Lee provided Gray with *Miranda* warnings when Gray was detained in the Hooters parking lot. This conversation was not memorialized, either through a recording or a written waiver. After Gray's vehicle was searched, Gray was transported to the nearby Deerfield Township post. Shortly after arriving there, Schweitzer conducted a formal interview, which was recorded.

**{¶35}** During this formal interview, Schweitzer told Gray he was "advised of his rights on the scene" and then asked Gray if he "understood" his rights as they were read or if he wanted Schweitzer to "advise them again." Gray made it clear that he understood those rights and did not have Schweitzer repeat them. Schweitzer also said to Gray, "You understand we are different cops, but just because we are different cops, you still have the same rights, right? Even though I am not the one who advised you of your rights, you still have the same rights, does that make sense to you?" Gray responded with, "Yeah, I know my rights. Yeah, I understand."

**{¶36}** Based upon this factual background, we conclude that Schweitzer was not required to re-advise Gray of his rights prior to conducting an interview. The purpose of examining the *Roberts* factors is to determine whether the initial warnings "became stale and remote so as to create a substantial possibility that the defendant was unaware of his

rights." *State v. Pack*, 2nd Dist. Montgomery No. 28459, 2020-Ohio-5210, ¶ 11. Ohio courts have consistently held that anywhere from several to 24 hours between the initial warnings and a subsequent interrogation is permissible when the offender remains in continuous custody. *State v. Grissom*, 1st Dist. Hamilton No. C-100542, 2011-Ohio-1796, ¶ 14-15 (finding that three to four hours between the initial warnings and the interview did not dilute the effectiveness of the initial warnings); *State v. Brewer*, 48 Ohio St.3d 50, 59-60 (1990) (affirming the denial of defendant's motion to suppress when a statement was made one day after defendant was advised of his *Miranda* rights by a different police department); *State v. Powell*, 132 Ohio St.3d 233, 253 (2012) (finding that the *Miranda* warnings were not stale where "[m]ore than 30 hours elapsed between the initial *Miranda* warnings and [defendant's] second interview" and the defendant remained in continuous custody).

**{¶37}** It is important to note that the *Roberts* factors present a question of degree; simply because the factor exists does not give rise to an inherent violation. It is not clear from the record how much time elapsed between Gray's initial warnings and the subsequent interview. However, Detective Schweitzer testified that Gray was transported from the Hooters parking lot to the Deerfield Township police station in about eight minutes. Detective Schweitzer also testified that Gray sat in the interrogation room for roughly another eight minutes before the interview began.[4] Further, although the location of the interview was different than the location of the initial warnings, the police station was mere minutes from the location where Gray received his initial warnings. It is undisputed that the officers conducting the interview were different from those who read Gray his rights, but Gray remained in continuous custody during the interval between the initial warnings and

4. In his own brief, Gray does not provide specific details on the amount of elapsed time, and does not allege that the length of time diluted the effectiveness of the initial warnings.

- 13 -

the subsequent interview. In reviewing these facts, they do not raise any concern that Gray was unaware of his rights when the interview was conducted.

{¶38} While we agree with the trial court that the officers' failure to "provide the advisement of rights in a manner that preserves them for judicial review is poor practice," we also agree with the trial court that the recording of the second interview demonstrates that Gray's waiver of his rights was "certain and unequivocal." Therefore, because the *Miranda* warnings initially provided to Gray remained effective throughout the second interview where he waived those rights, the trial court did not err by denying Gray's motion to suppress. Accordingly, the first assignment of error is overruled.

{¶39} Assignment of Error No. 2:

{¶40} REPRESENTATION BY TRIAL COUNSEL WAS "INEFFECTIVE" UNDER *STRICKLAND V. WASHINGTON.*

{¶41} In his second assignment of error, Gray asserts that he received ineffective assistance of counsel because his trial counsel failed to subpoena a witness and failed to object to the amount of marijuana shown to the jury.

**A. STANDARD OF REVIEW**

{¶42} The Sixth Amendment to the United States Constitution guarantees individuals the right to effective counsel. *Strickland v. Washington*, 466 U.S. 668, 685-686, 104 S.Ct. 2052 (1984). Counsel is deemed ineffective where counsel's conduct undermines the judicial process in such a way that the result of defendant's trial cannot be relied on has having produced a just result. *Id.* at 686. To prevail on an ineffective assistance of counsel claim, the defendant must make the two-prong showing outlined in *Strickland* by proving that (1) counsel's performance fell below an objective standard of reasonableness, and (2) but for counsel's errors, the outcome of the proceedings would have been different. *State v. Baker*, 12th Dist. Clermont No. CA2005-11-103, 2006-Ohio-5507, ¶ 5.

**{¶43}** In evaluating the first prong, we must give great deference to counsel's performance and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at ¶ 6. With respect to the second prong, the defendant must show that there is a reasonable probability, absent counsel's errors, the outcome of the proceeding would have been different. *State v. Schenck*, 12th Dist. Preble No. CA2021-02-003, 2022-Ohio-430, ¶ 30. "The prejudice inquiry thus focuses not only on outcome determination, but also on 'whether the result of the proceeding was fundamentally unfair or unreliable.'" *Id.*, quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838 (1993).

**{¶44}** Gray argues that he was prejudiced by his trial counsel for not calling Faris to the stand to testify. Gray avers that, had Faris been given the opportunity to testify, Faris would have provided information to support Gray's assertion that Gray agreed to purchase legal hemp, and not marijuana, from Faris. Gray further argues that his trial counsel should have objected to additional amounts of marijuana being shown to the jury that went beyond what was found in Gray's vehicle. We will address each of these in turn.

### B. FAILURE TO SUBPOENA A WITNESS

**{¶45}** While trial counsel should consult with their client in matters of important trial decisions, Ohio law gives great latitude to defense counsel regarding trial strategy. *State v. Murphy*, 12th Dist. Butler No. CA2009-05-0128, 2009-Ohio-6745, ¶ 24, *citing State v. Smith*, 17 Ohio St.3d 98 (1985), fn. 1. This court has consistently held that "[t]he mere failure to subpoena a witness for a trial is not a substantial violation of defense counsel's essential duty absent a showing of prejudice." *State v. Smith*, 12th Dist. Fayette No. CA20060-08-030, 2009-Ohio-197, ¶ 54. Further, the appellant bears the burden of showing that the testimony of a witness not subpoenaed would have "significantly assisted the defense and affected the outcome of the case." *State v. Wells*, 12th Dist. Warren No.

CA2005-04-050, 2006-Ohio-874, ¶ 12.

**{¶46}** Gray asserts in his brief that he relied on Faris' representations that the substances provided by Faris were legal hemp and not illegal marijuana. Gray argues that Faris would have supported these assertions if given the opportunity to testify. In making this argument, Gray offers mere speculation, which is "insufficient to find error on behalf of trial counsel." *Id.* at ¶ 14. Aside from the speculative nature of Faris' testimony, there is no reason to believe that the testimony would affect the outcome of the case. The state presented evidence strongly indicating that Gray knew he was not dealing with a legal substance.

**{¶47}** Among this evidence was Gray's custodial interview with Detective Schweitzer. During the interview, Gray told Schweitzer that Faris "first wanted to send me just a little personal weed and I dibbled and dabbled a little bit" and then "[Faris] came up with the idea that he wanted to start shipping these containers to me with a bunch of pot in them." Gray also told Schweitzer that, "according to [Faris], [Faris] has some sort of huge marijuana farm out in California—that's what [Faris] does you know, he wheels and deals marijuana." Several times, Gray mentions that Faris has people "all over" that Faris deals with, and Gray described several encounters he had with Faris to assist him in unloading "a bunch of weed." Gray does tell Schweitzer that some of what was located in his storage facility was hemp, but when Schweitzer asked Gray, "Well how much weed is in there? I don't care about no hemp," Gray responds, "About 20 pounds." Gray doesn't mention hemp in the interview again.

**{¶48}** We do not find that counsel's decision to not subpoena Faris prejudiced Gray. What Faris may have testified to is entirely speculative and Gray fails to demonstrate that any potential testimony by Faris would have significantly assisted his defense and affected the outcome of the case.

## C. FAILURE TO OBJECT TO THE PRESENTATION OF EVIDENCE

{¶49} Gray also argues that his defense counsel should have objected to the presentation of the marijuana found in Sandlin's vehicle. He asserts that this evidence prejudiced him in front of the jury because it was "contraband not attributable to his conduct."

{¶50} Relevant to this assignment of error is Gray's charge for engaging in a pattern of corrupt activity under R.C. 2923.32(A)(1). The statute mandates that no person who is employed by or associated with any enterprise shall conduct or participate in, either directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity. R.C. 2923.32(A)(1). A "pattern of corrupt activity" requires "two or more incidents of corrupt activity * * * that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E). "Corrupt activity" includes Gray's alleged acts of trafficking in marijuana and possessing marijuana. R.C. 2923.30(I)(2)(c).

{¶51} Upon review, we find this assignment of error unpersuasive. Under Evid.R. 403(A), relevant evidence must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, or confusion of the issues, or of misleading the jury." Evid.R. 403(A). To establish that Gray engaged in a pattern of corrupt activity, "the state must show that the defendant was 'associated with' an 'enterprise.'" *State v. Sparks*, 12th Dist. Warren Nos. CA2013-02-010 and CA2013-02-015, 2014-Ohio-1130, ¶ 20. As the state is charged with proving each and every element of this offense, the state presented evidence that Gray, Faris, and Sandlin were "associated-in-fact," meaning that the group was a "continuing unit that function[ed] with a common purpose." *Id.*

{¶52} The state's presentation of the marijuana found in Sandlin's vehicle was probative of the charge of engaging in a pattern of corrupt activity. The presentation of this

additional marijuana may have been prejudicial to Gray, but it's probative value far outweighed any claim of prejudice, as it provided relevant evidence to the jury to allow them to determine whether Gray engaged in a pattern of corrupt activity, or participated in an isolated drug transaction unrelated to Sandlin or Faris. Therefore, trial counsel's objection to the presentation of this evidence would have been futile. "An attorney is not ineffective for failing to make futile requests[.]". *State v. Brown*, 12th Dist. Clermont No. CA2018-05-027, 2018-Ohio-4939, ¶ 11; *State v. Allen*, 4th Dist. Ross No. 21CA3736, 2022-Ohio-1180, ¶ 36 ("[T]he failure to make a futile objection does not constitute deficient performance for an ineffective assistance of counsel claim"). Further, the making of objections is a strategic decision which should not be second-guessed by the court. *Strickland* at 686.

{¶53} Accordingly, because we find trial counsel was not ineffective for failing to subpoena Faris or failing to make a futile objection, this assignment of error is overruled.

{¶54} Assignment of Error No. 3:

{¶55} THE TRIAL COURT ERRED TO DEFENDANT-APPELLANT'S PREJUDICE WHEN IT SENTENCED DEFENDANT ON COUNT I.

{¶56} In his third assignment of error, Gray argues that the court should have only sentenced him to a minimum of five years on Count 1 without including the indefinite term.

## A. STANDARD OF REVIEW

{¶57} We note that Gray did not object to the calculation of his sentence, thus he is limited to a review for plain error pursuant to Crim.R. 52(B). To constitute plain error, there must be (1) a deviation from a legal rule, (2) an error that is "fundamental, palpable, and obvious on the record such that it should have been apparent to the court without an objection", and (3) the error must have "affected the defendant's substantial right, that is, the error must have affected the outcome of the trial." *State v. Dawson*, 12th Dist. Butler No. CA2021-08-099, 2022-Ohio-2984, ¶ 11. The defendant bears the burden of

demonstrating that a plain error affected his substantial right. *State v. Perry*, 101 Ohio St.3d 118, 120, 2004-Ohio-297. However, even if the defendant satisfies this burden, an appellate court has discretion to disregard the error, and should correct it only to "prevent a manifest miscarriage of justice." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002) ("Even if a forfeited error satisfies these three prongs, however, Crim.R. 52[B] does not demand that an appellate court correct it. Crim.R. 52[B] states only that a reviewing court 'may' notice plain forfeited errors; a court is not obliged to correct them").

## B. CALCULATION OF INDEFINITE SENTENCES

{¶58} Gray asserts that the trial court deviated from the mandates of R.C. 2929.144, which provide instructions for calculating indefinite sentences for qualifying felonies. Specifically, Gray asserts that the trial court erred in sentencing him to multiple indefinite sentences.

{¶59} The minimum terms for qualifying felonies are calculated pursuant to division (A)(1)(a) or (2)(a) of R.C. 2929.14. Division (A)(1)(a) provides that, for a felony of the first degree, the prison term shall be an indefinite term with a stated minimum term between three and 11 years, as selected by the court, and a maximum term that is determined pursuant to R.C. 2929.144(B)(2). Similarly, division (2)(a) provides that, for a felony of the second degree, the prison term shall be an indefinite term with a stated minimum term between two and eight years, as selected by the court, and a maximum term that is determined pursuant to R.C. 2929.144(B)(2). Thus, the court has discretion when imposing the minimum terms of imprisonment. The maximum terms, however, are determined from a mathematical formula pursuant to R.C. 2929.144.

{¶60} Applicable here is R.C. 2929.144(B)(2), which provides that when an offender, like Gray, is sentenced to more than one felony, and at least one of the felonies is of the first or second degree, and the court orders at least some of the prison terms to be served

consecutively, the court calculates the range of the total sentence in two steps. First, to calculate the low-end of this range (the minimum), the court must add all of the minimum terms for qualifying felonies that are to be served consecutively with all of the definite terms for non-qualifying felonies. Second, to calculate the high-end of the range (the maximum), the court must add the minimum terms from the first step plus 50 percent of the longest minimum term or definite term for the most serious felony being sentenced. R.C. 2929.144(B)(2).

{¶61} As reflected in the sentencing entry, the court merged Counts I and II, both of which are felonies of the second degree. For Count I, the court imposed a minimum sentence of 5 years and a maximum sentence of 7 ½ years. For Count IV, a felony of the first degree, the court imposed a minimum sentence of 3 years and a maximum sentence of 4 ½ years to be served consecutively to the sentence for Count I. The court then calculated the mandatory minimum sentence to be 8 years, with a possible maximum sentence of 9 ½ years.

{¶62} Gray asserts that the sentencing entry for Count I should only reflect the minimum of 5 years without any indefinite terms. We agree with Gray, as well as with the Eighth District, that "when one or more qualifying felonies are ordered to be served consecutively, R.C. 2929.144(B)(2) only allows the court to impose 50 percent of the longest minimum term for the most serious felony being sentenced and does not allow the court to impose consecutive indefinite prison terms." *State v. Bond*, 8th Dist. Cuyahoga No. 110022, 2022-Ohio-1487, ¶ 13. Thus, the trial court could only impose an indefinite term for the "the most serious felony" which, in this case, was Count IV and not Count I. [5]

---

5. At the sentencing hearing, the court did not state an indefinite sentence for Count 1. In sentencing Gray, the court stated, "So with regard to the Count 1, I am going to sentenced you to 5 years in prison. That is a mandatory prison period. The 5 years for Count 2 will merge into Count 1, so that is only one sentence. With regard to Count 4, I am going to impose a 3-year prison sentence. That is going to be consecutive to the time

**{¶63}** However, because we review the error under a plain error standard, Gray bears the burden of demonstrating that the trial court's error "affected his substantial right." We find that Gray has failed to do so. In sentencing Gray, the trial court did not err in its calculation of the maximum prison terms. The court properly added both minimum terms— 5 years for Count I and 3 years for Count IV—for a total minimum sentence of 8 years. The court also properly added 50 percent of the longest minimum term for the most serious felony. The most serious felony in Gray's case was Count IV, where the court imposed a minimum sentence of 3 years. Fifty percent of 3 years is 1 ½ years, and when added to the minimum sentence of 8 years, the maximum sentence totals 9 ½ years.

**{¶64}** The trial court's sentencing entry does not affect Gray's substantial rights. The court properly calculated the minimum prison sentence to be 8 years, and thus there is no risk that Gray will serve an improper sentence based on the error in the sentencing entry. As we find that Gray's challenge does not rise to the level of plain error, we overrule Gray's third assignment of error.

## CONCLUSION

**{¶65}** The trial court did not err in denying Gray's motion to suppress. The law enforcement officers in this case had probable cause to search Gray's vehicle, including the trunk, based not only on the response of the canine's free-air sniff, but the facts and circumstances known at the time of the search. Further, the motion was properly denied as Gray was provided *Miranda* warnings at the time of the search and those warnings were not rendered stale by a short passage of time and an inconsequential change in location. In addition, Gray's counsel was not ineffective for failing to subpoena Faris and failing to

---

that you do for the Count 1, for a total of 8 years in prison. Now, you have been convicted of a sentence that carries with it an indefinite sentence. That means you get both a minimum prison term and a maximum prison term. In this case, I believe that because the most serious offense that I am sentencing you for is the F1, that means that your indefinite sentence is one-half of that term, which is 1 ½. So, your sentence is going to be 8 years to 9 ½ years because 1 ½ is the felony of the first degree because that is the most serious felony."

- 21 -

object to evidence that was relevant and probative to the state's case. While the trial court's sentencing entry contains a minor error, that error does not rise to the level of plain error in this case as it has no effect on Gray's minimum mandatory prison sentence.

**{¶66}** Judgment affirmed.

M. POWELL, P.J., and PIPER, J., concur.